**UNITED STATES of America,**
**Plaintiff,**

v.

**GENERAL MOTORS CORPORATION,**
**Defendant.**

**Civ. A. No. 3298–70.**

United States District Court,
District of Columbia.

June 13, 1974.

Nathan Dodell, Asst. U. S. Atty., Washington, D. C., for plaintiff.

Lloyd N. Cutler, Washington, D. C., for defendant.

## OPINION

GASCH, District Judge.

This matter is before the Court on plaintiff's motion for summary judgment and defendant's opposition thereto.[1] Plaintiff's complaint, filed on November 6, 1970, is the first action of its kind brought pursuant to the National Traffic and Motor Vehicle Safety Act of 1966, as amended (Act of September 9, 1966, 80 Stat. 718 et seq., 15 U.S.C. § 1381 et seq.) (hereinafter referred to as the Act). Specifically, plaintiff seeks a judgment declaring that defendant has violated Section 108(a)(4) (15 U.S.C. § 1397(a)(4)) of Title I of the Act by failing to issue safety defect notifications in regard to 15 x 5.50 Kelsey-Hayes disc wheels (hereinafter referred to as WHEELS).[2]

It was the determination of the Director of the National Highway Safety Bureau[3] (hereinafter referred to as the Director), acting pursuant to Section 113(e)(2) (15 U.S.C. § 1402(e)(2)), that the WHEELS contain a "defect which relates to motor vehicle safety." Accordingly, by letter dated November 4, 1970, the Director notified the defendant of his determination and direct-

ed General Motors to furnish the notification specified in Section 113(c) of the Act (15 U.S.C. § 1402(c)).

Defendant counterclaims for judicial review of this determination by the Director and asks this Court to declare the November 4, 1970, determination and direction unlawful and void. Further, defendant seeks an injunction restraining the enforcement of the Director's order.[4]

## I. FACTUAL BACKGROUND.

Defendant is a corporation organized under the laws of Delaware and a "manufacturer" within the meaning of Section 102 of the Act (15 U.S.C. § 1391). During the years 1960 through 1965, defendant manufactured approximately 321,743 three-quarter ton GMC and Chevrolet pickup trucks (hereinafter referred to as TRUCKS). It is estimated that approximately 200,000 of these TRUCKS[5] were equipped with the WHEEL which was optional equipment.[6]

This action has its origin in 1968 when the National Highway Safety Bureau (NHSB) (now the National Highway Traffic Safety Administration), following up on reports of failures of these WHEELS, requested information from the defendant in connection with vehicles equipped with the WHEEL. As a result of this preliminary investigation, NHSB issued an Investigation Report (Part I) on April 2, 1969. At this

---

1. This Court has granted leave for Mr. Ralph Nader, Mr. Larry Silverberg, Physicians for Automotive Safety, and the Center for Auto Safety to participate as *amici curiae* in this case.

2. Additionally, plaintiff seeks $400,000 in civil penalties from the defendant for failure to issue the safety-defect notifications pursuant to 15 U.S.C. § 1398(a). The Court will not decide whether this $400,000 penalty is appropriate at this time. Accordingly, the plaintiff will submit memoranda on this subject 14 days from the issuance of this opinion and defendant will respond 14 days thereafter.

3. The Director acts pursuant to the authority delegated to him by the Secretary of Transportation. 49 C.F.R. § 1.51.

4. This procedure for judicial review sought by defendant is apparently authorized by 5 U.S.C. § 703, which provides, *inter alia*, that "agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement."

5. Approximately 50,000 of these TRUCKS equipped with the WHEEL were eventually equipped with campers or special bodies by the owners.

6. The reason that such a high percentage of purchasers chose this optional equipment, it has been submitted, is that the tires could be installed, changed, or repaired in the field without resort to a service station. This factor appealed to the camper enthusiast. Consequently, it has been estimated by defendant that 810,000 of these WHEELS were installed on the TRUCKS.

time, the report noted that failures had been reported to both NHSB and General Motors and attention was focused on alleged "flaws" or "cracks" in the gutter that might be a cause of the failure of the WHEEL. The defendant, by letter of April 19, 1969, argued that there was no manufacturing defect and further that the number of failures, admitted by General Motors to be "significant" could be solely attributed to owner abuse through overloading.[7]

A. Initial Administrative Actions.

1. The Letters and the "Settlement."

Notwithstanding defendant's contention then, and its contention now, that owner abuse through overloading was the cause of the WHEEL failures, General Motors saw fit to inform owners of the TRUCKS, in a letter of May 28, 1969, that there existed "a serious safety risk in certain 15 x 5.50 three-piece disc wheels." Furthermore, in this letter defendant noted that

> [T]he problem is serious under conditions of heavy loading, such as when the truck is equipped with an over-the-cab type camper. Specifically, if one of these trucks is overloaded and the tires are overinflated, these wheels are subject to sudden fracturing and breaking apart during use. Such occurrences result in immediate loss of air from the tire, which can come off the wheel, possible loss of control of the vehicle, and substantial risks of serious harm to persons and property in the vicinity . . . .
>
> In view of the potential safety hazard arising from the continued use of three-piece wheels if you have an over-cab camper or other heavy special body on your truck, or may attach one in the future, we urge that you replace the wheels as soon as possible.

Also, if your truck was purchased as a used vehicle and you are unable to determine that it was equipped with a camper or other special body or not overloaded by owners prior to your purchase, a prudent course of action would be to replace the wheels . . . .

This May 28 letter was mailed to 280,000 TRUCK owners. Upon further investigation, however, the Acting Federal Highway Administrator,[8] by letter of August 25, 1969, notified defendant that a preliminary determination had been made that a defect relating to motor vehicle safety existed with respect to the TRUCKS equipped with the WHEELS.

Defendant was offered an opportunity to respond to the allegations as provided by Section 113(e) (15 U.S.C. § 1402(e)). Taking advantage of this opportunity, defendant, by letter of September 11, 1969, while denying the existence of a defect and again asserting owner abuse as the cause of the failures, made the candid admission that

> "[A] brief period of excess loading can cause a crack to occur in a wheel. Thereafter, such a crack may develop to the point of wheel failure with further use of the wheel even under proper load."[9]

Prior to the final determination by the government, the defendant made a settlement offer which would include the replacement, at defendant's expense, of the WHEELS on all TRUCKS *equipped with campers or other special bodies.* This settlement was agreed upon and the Section 113 proceeding was properly closed. However, the agency reserved its right to take further action "if it becomes necessary in the interests of safety."[10]

7. It is worthy of note that General Motors, upon consideration of the "significant" number of WHEEL failures, cancelled the use of the WHEEL at the end of the 1965 model year and substituted a 16-inch wheel and tire which increased the rear-wheel load-carrying ability by 20 percent within the same gross vehicle weight.

8. The Acting Federal Highway Administrator at that time was the officer charged with administering the Act.

9. Letter of September 11, 1969, at 8.

10. The settlement acceptance included, in pertinent part, the following language:

Basically, the acceptance of your settlement proposal is in the public interest

Commencing October 7, 1969, the defendant mailed a second letter to TRUCK owners offering to replace the WHEELS in accordance with the terms of the settlement. In carrying out this agreement, defendant gave the owners the option of selecting as a replacement a 15 x 5.50 two-piece wheel which General Motors described as "having an increased safety factor over the three-piece 15 inch wheel," [11] or a 16 x 6.00 two-piece wheel. It is noteworthy that the 15-inch replacement wheel had exactly the same tire-wheel combination load carrying capacity as the Kelsey-Hayes three-piece disc wheel.

The termination of the Section 113 proceeding was announced on October 9, 1969. The defendant, pursuant to government request, stated that as of February 23, 1970, it had replaced 22,452 WHEELS in accordance with the October 7, 1969, offer. As of the present, it has been reported by General Motors that 62,229 WHEELS have been replaced.

## 2. The Nader Suit and the Reopening of the Proceedings.

On March 31, 1970, Mr. Ralph Nader commenced an action in this Court styled Nader v. Volpe, Civ. No. 960–70, seeking to have this Court set aside the October, 1969, settlement and compelling the Secretary of Transportation and others to reconsider whether there was a defect in Kelsey-Hayes WHEELS on TRUCKS *without special bodies or campers.*

The *Nader* suit was grounded upon a misstatement respecting the findings of the National Highway Safety Bureau engineers contained in the October 9, 1969, termination announcement. In that announcement it was erroneously reported that the government engineers had discovered no safety hazards in TRUCKS equipped with the WHEELS but not equipped with camper or special bodies. In fact, the conclusion of the engineers was to the contrary, *i. e.,* that all trucks equipped with the WHEELS presented a safety hazard.[12]

Judge Waddy of this Court, upon consideration of the arguments of counsel, ordered the case remanded to the agency with directions that it complete its investigation of the TRUCKS not equipped with campers or other special bodies (hereinafter referred to as PLAIN TRUCKS).[13] The agency did report back on September 14, 1970, and it concluded that a defect did exist as to the PLAIN TRUCKS.[14]

---

since (a) it will result in a second notification letter being sent to all truck owners, and (b) it will result in the recall and replacement of, at GM's expense, all three-piece disc wheels installed on trucks with campers or special bodies thereon. This compromise is consistent with our ultimate objective in these matters, which is to take that course of action which will best serve the safety interests of the motoring public. Accordingly, we accept your offer in compromise of this matter and hereby notify you of the termination of the pending Section 113 proceeding. However, we cannot agree to your proposal that the proceeding 'will not be subject to reopening.' The Department must, in any case of this nature, reserve the right to take further action if it becomes necessary in the interests of safety, based on further information, such as information as to wheel failures involving trucks on which no camper or special body is attached under clear non-overload conditions.

Please send us a representative copy of your communication to vehicle owners and dealers concerning this matter, and please advise us periodically of the number of owners who accept your offer.

11. Letter of October 7, 1969, at 1.

12. *See* Order signed by Judge Waddy on June 26, 1970, in the *Nader* case.

13. *Id.*

14. The September, 1970, report, Part III of the Investigation, summarized its conclusions in the following manner:
1. A significant number of wheel failures has occurred on trucks not equipped with campers or special bodies under loads which are below the wheel strength level specified by the truck builder.
2. The number of known wheel failures on plain pickup trucks is 98 as of August 29, 1970.
3. The available information does not support the GM contentions that excessive in-

### B.   Further Agency Action.

As a consequence of this finding of September 14, 1970, the agency on that date informed defendant of its initial finding of a defect in regard to the PLAIN TRUCKS and defendant once again utilized its statutory right to reply.

As noted previously, on November 4, 1970, defendant was informed by the Director that he had determined that the TRUCKS equipped with the WHEELS contain a defect which relates to motor vehicle safety in that the WHEELS on the PLAIN TRUCKS have been, and continue to be, subject to sudden and catastrophic failure resulting in accidents and injuries to persons using the highways thus resulting in an unreasonable risk of accident, injuries, and death to persons using the highways. Defendant was directed to furnish the statutory notification.

### C.   Judicial Proceedings: The Delaware Action and the Filing of the Instant Suit.

General Motors decided to resist the government order and filed suit in the District Court of Delaware on November 4, 1970, seeking declaratory relief from the Director's determination. Judge Wright of that Court refused jurisdiction in favor of this Court in light of the government filing of the instant action on November 6, 1970.[15]

### II.   SUMMARY JUDGMENT.

On the basis of the record before this Court, plaintiff has urged the granting of summary judgment. Prior to discussing at length the facts which plaintiff alleges establish that there is no genuine issue of material fact, it is necessary to examine the statutory context and statutory grounds upon which plaintiff bottoms its motion. This examination is undertaken to define precisely what plaintiff must establish to meet its burden of proving the existence of a defect.[16] In view of the fact that this is the first case to raise this question, it is of utmost importance to examine the Act carefully to determine Congressional intent.

### A.   The Act: "Defect in Performance."

The intent of Congress in passing this consumer oriented legislation is illustrated in Section I of the Act (15 U.S.C. § 1381) where it is declared that the purpose of the legislation "is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." To achieve this goal Congress included the statutory defect notification provisions.

Section 113 of the Act (15 U.S.C. § 1402) [17] provides that should the Secre-

---

flation pressures, or that overloads account for all of the wheel failures that have occurred.

4.   The available information does not support the GM contentions that the strength of the wheel varies with the size of the tires installed nor that multiple failures on individual trucks are always the result of overloading.

5.   Wheel failures on trucks not equipped with campers or special bodies are continuing to occur.

15.   Judge Wright's opinion in General Motors v. Volpe can be found at 321 F.Supp. 1112 (D.C.1970), affirmed as modified, 457 F.2d 922 (3rd Cir. 1972).

16.   It is clear that plaintiff as the moving party has the burden of clearly demonstrat-

ing the absence of any genuine issue of fact. Washington v. Cameron, 133 U.S.App.D.C. 391, 395–396, 411 F.2d 705, 709–710 (1969); Underwater Storage, Inc. v. United States, 125 U.S.App.D.C. 297, 371 F.2d 950 (1966), cert. denied, 386 U.S. 911, 87 S.Ct. 859, 17 L.Ed.2d 784 (1967). The question that remains, however, is what facts must be established under this Act to prove a *prima facie* case of the existence of a defect.

17.   This provision provides in relevant part: (a) Every manufacturer of motor vehicles or tires shall furnish notification of any defect in any motor vehicle or motor vehicle equipment produced by such manufacturer which he determines, in good faith, relates to motor vehicle safety, to the purchaser (where known to the manufacturer) of such motor vehicle or motor

tary of Transportation determine that any motor vehicle or item of motor vehicle equipment "contains a defect which relates to motor vehicle safety," the manufacturer must notify each purchaser of the existence of such a defect, the risk it poses, and the measures necessary to repair the defect.

The crucial language which this Court must interpret is the phrase "defect which relates to motor vehicle safety." It is the contention of the defendant that if this phrase is read as intended by Congress, the government must show in establishing the existence of a defect

[e]ither that the wheels were not properly designed or manufactured or that they currently fail when used in

their intended manner on nonoverloaded straight pickups at a rate posing an unreasonable risk of accidents.[18]

The government, on the other hand, strongly argues that a correct reading of this language obligates the government to prove only that there are "large numbers of failures" of the WHEEL without regard to whether that WHEEL was overloaded or put to its intended use, as defendant urges.

In support of its argument, the plaintiff points to the definition of defect under Section 102(11) of the Act (15 U.S. C. § 1391(11)):

(11) "Defect" includes any defect in performance, construction, compo-

---

vehicle equipment, within a reasonable time after such manufacturer has discovered such defect.

(b) The notification required by subsection (a) . . . shall be accomplished—

(1) by certified mail to the first purchaser (not including any dealer of such manufacturer) of the motor vehicle or motor vehicle equipment containing such a defect, and to any subsequent purchaser to whom has been transferred any warranty on such motor vehicle or motor vehicle equipment; and

(2) by certified mail or other more expeditious means to the dealer or dealers of such manufacturer to whom such motor vehicle or equipment was delivered.

(c) The notification required by subsection (a) . . . shall contain a clear description of such defect, an evaluation of the risk to traffic safety reasonably related to such defect, and a statement of the measures to be taken to repair such defect.

(d) Every manufacturer of motor vehicles or tires shall furnish to the Secretary a true or representative copy of all notices, bulletins, and other communications to the dealers of such manufacturer or purchasers of motor vehicles or motor vehicle equipment of such manufacturer regarding any defect in such vehicle or equipment sold or serviced by such dealer. The Secretary shall disclose so much of the information contained in such notice or other information obtained under section 1401(a) of this title to the public as he deems will assist in carrying out the purposes of this chapter, but he shall not disclose any information which contains or relates to a trade secret or other matter referred to in section 1905 of Title 18 un-

less he determined that it is necessary to carry out the purposes of this chapter.

(e) If through testing, inspection, investigation, or research carried out pursuant to this subchapter, or examination of reports pursuant to subsection (d) of this section, or otherwise, the Secretary determines that any motor vehicle or item of motor vehicle equipment—

(1) does not comply with an applicable Federal motor vehicle safety standard prescribed pursuant to section 1392 of this title; or

(2) contains a defect which relates to motor vehicle safety; then he shall immediately notify the manufacturer of such motor vehicle or item of motor vehicle equipment of such defect or failure to comply. The notice shall contain the findings of the Secretary and shall include all information upon which the findings are based. The Secretary shall afford such manufacturer an opportunity to present his views and evidence in support thereof, to establish that there is no failure of compliance or that the alleged defect does not affect motor vehicle safety. If after such presentation by the manufacturer the Secretary determines that such vehicle or item of equipment does not comply with applicable Federal motor vehicle safety standards, or contains a defect which relates to motor vehicle safety, the Secretary shall direct the manufacturer to furnish the notification specified in subsection (c) of this section to the purchaser of such motor vehicle or item of motor vehicle equipment as provided in subsections (a) and (b) of this section.

18. Memorandum of Defendant in Opposition to Plaintiff's Motion for Summary Judgment at 22.

nents, or materials in motor vehicles or motor vehicle equipment.

Plaintiff emphasizes the phrase *defect in performance* and contends that Congress through the use of such language intended that the manufacturer be obligated to issue a notification if there are a "large number of failures" without regard to whether there is a cognizable defect in design or cause shown for the failures. In addition, the government looks to Section 102(1) of the Act (15 U.S.C. § 1391(1)) which again highlights Congressional utilization of the term "performance." Section 102(1) defines "motor vehicle safety" in the following manner:

(1) "Motor vehicle safety" means the *performance* of motor vehicles or motor vehicle equipment in such a manner that the public is protected against unreasonable risk of accidents occurring as a result of the design, construction or *performance* of motor vehicles and is also protected against unreasonable risk of death or injury to persons in the event accidents do occur, and includes nonoperational safety of such vehicles. (Emphasis added.)

■ There is strong support for the plaintiff's argument when these two sections are read in conjunction. As this Court reads the statute, Congress did indeed intend to have the manufacturer issue such notifications not only when there was a cognizable defect in design or manufacture but also when the evidence reveals a large number of failures of components or materials, *i. e., fail-*

*ures in performance,* regardless of the cause.

■ Admittedly, this interpretation of the statute also reflects a Congressional intent to go beyond the common law theories of negligence, strict liability, and warranties which provide that misuse of the product is a defense to liability for damages caused by the failure of a product.[19] However, this is not a case in which it is sought to hold the defendant liable for the damages caused by the failure of a product. This statute is designed specifically to warn a consumer before an accident occurs and a defect in performance, such as a "large number of failures," exposes the consumers to dangers of which they should promptly be notified.[20] It thus becomes clear that allusions to concepts of negligence law and the law of strict liability are inapposite to the statute's stated purpose. As noted by the Court in Larsen v. General Motors Corporation, 391 F.2d 495, 506 (8th Cir. 1968):

[I]t is apparent that the National Traffic Safety Act is intended to be supplementary of and in addition to the common law of negligence and product liability.

The conclusion of the Court, therefore, upon a reading of the entire statute[21] and the plain language of the Act is that Congress meant to have notifications issued by the manufacturer if there existed a "large number of failures." The language "defect in performance" forcefully demands such a result. As the Court of Appeals for this

---

19. *See* Prosser, The Law of Torts § 96 n. 97 (3d ed. 1964), and cases cited therein. Congressional awareness of the distinction between the statutory scheme and the common law is reflected in the language of Section 108(c) of the Act (15 U.S.C. § 1397(c)) which states:

Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from liability under the common law.

20. The only defenses available to the defendant under Section 113(e)(2) of the Act (15 U.S.C. § 1402(e)(2)) is that there "is no

failure of compliance or that the alleged defect does not affect motor vehicle safety." Where the agency shows that there is a *prima facie* case of a defect in performance through the submission of evidence of a large number of failures of the WHEEL, the only defense in such an instance is that this large number of failures did not occur for it is clear that failures of wheels are clear dangers to motor vehicle safety. As will be discussed, *infra,* defendant has not set forth evidence to support this available defense.

21. Sutherland, Statutes and Statutory Construction, § 46.05 (3d ed. 1973).

Circuit has stated in construing the National Environmental Policy Act:

> It is, after all, the plain language of the statute which *all* members of both houses of Congress must approve or disapprove. The courts should not allow that language to be significantly undercut. In cases such as this one, the most we should do to interpret clear statutory wording is to see that the *overriding purpose* behind the wording supports its plain meaning. (Emphasis in original.)

Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 51, 449 F.2d 1109, 1127 (1971).

■ Although defendant might assert that the language of the Act is not as clear and unambiguous as the language of the National Environmental Policy Act, it appears to this Court that one very clear way that a "defect in performance" can be indicated is by looking to the number of failures. Inasmuch as the overriding purpose of the Act is uniform and prompt notification of defects,[22] it is beyond peradventure that plaintiff's "large number of failures" theory supports that Congressional purpose. The construction of the Act advocated by the agency appears to be the more closely attuned to accomplishing the intent of Congress. It is axiomatic

> [t]hat Courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute.

Investment Co. Institute v. Camp, 401 U.S. 617, 626–627, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1970); *see also* Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Defendant's argument in this case would have the contrary result of requiring the government, in proving the existence of a defect, to attempt to show at trial that every failure was not due to owner abuse. Such a result would be contrary to Congressional intent and negate any practical value of the notification scheme outlined in the Act.

### B. The Law to be Applied as to Summary Judgment.

Preliminary to examining the facts which plaintiff urges support its motion for summary judgment, it is necessary briefly to set forth the rules to be applied in connection with this motion.

■ First, all parties are agreed that defendant has the right to *de novo* review of the agency decision—this is not a case of review of an administrative record. Thus, if this Court found that a genuine issue of material fact existed, this case would go to trial. In that regard, this Court will not use the summary procedure in lieu of a trial. The case of Pen-Ken Gas & Oil Corp. v. Warfield, 137 F.2d 871, 877 (6th Cir. 1943), succinctly sets forth the parameters in which courts should operate in considering summary judgment motions:

> The rule [Rule 56] should not be used by the Court for the trial of disputed questions of fact upon affidavits, but when it is invoked by either party to a case and a showing is made by the movant, the burden rests on the opposite party to show that he has a plausible ground for the maintenance of the cause of action alleged in his complaint, or if a defendant, that he has a ground of defense fairly arguable and of a substantial character.[23]

22. Congressional purpose is reflected in the House Committee Report in relation to the notification provision when it states:
This section was included to afford a means for *uniform and prompt notification* to vehicle owners of the discovery of any defects related to safety. "Defect" is a defined term which includes any defect in performance, construction, components, or materials in motor vehicles or motor vehicle equipment. (Emphasis added.)
H.Rep.1776, 89th Cong., 2d Sess. p. 28.

23. Quoted in Ashwell & Company v. Transamerica Insurance Company, 407 F.2d 762 (7th Cir. 1969) at 766; *see also* Bruce Construction Corp. v. United States, 242 F.2d 873 (5th Cir. 1967) ( . . . "when a mov-

Accordingly, the examination of facts upon which plaintiff bases its summary judgment motion, *infra*, will be directed at discovering whether plaintiff has shown that no genuine issue of material fact exists as to the occurrence of a "large number of failures" and if so, whether defendant has a ground of defense which raises a genuine issue of material fact which must be tried.

C. The Facts Supporting Plaintiff's Motion for Summary Judgment and General Motors' Defense.

After a careful review of this voluminous record, it is the Court's conclusion that plaintiff has made a *prima facie* case that a "large number of failures" do exist thus establishing, under this Court's test, a safety-related defect.

The primary undisputed facts that lead the Court to this conclusion are the following. First, it is undisputed that General Motors received 2,361 reports of failures.[24] Perhaps more importantly, the defendant states in its pleadings that "General Motors has never denied that a significant number of wheels failed." [25]

Additionally, the government has conducted a stratified random sampling of a population constructed from the 1,319 owners of TRUCKS identified by General Motors as having reported WHEEL failures. That study conducted by Dr. G. Koch had as its goal the collection of affidavits from sample owners detailing whether or not WHEEL failures had actually occurred on any TRUCK owned by a person in the sample population. Further, once such affidavits were ob-

tained that information was utilized to draw inferences as to the overall population.

Dr. Koch and the government did suceed in gathering 154 affidavits which revealed 393 [26] actual WHEEL failures. Moreover, based on the random sampling and the use of 95 per cent confidence intervals, Dr. Koch concluded that: (1) there would be at least 670 owners taken from the list of those who reported WHEEL failures to General Motors who would be willing to furnish affidavits regarding the failure of WHEELS on TRUCKS if they had been contacted for that purpose; this group would have reported 1,400 failures; and (2) based upon the list of owners who had reported WHEEL failures to the agency combined with the list furnished by General Motors, 707 owners on the combined list, if asked, would have furnished affidavits detailing some 1,503 WHEEL failures.

The 160 affidavits that are attached to the government's motion report 436 WHEEL failures. The most crucial factor in determining that summary judgment should be granted to plaintiff is that defendant has *not disputed* in any significant respect the authenticity of these affidavits. In fact, Ralph Morrison, Manager of General Motors Field Campaigns Service Department, has admitted through deposition that based upon the over 2,300 reported failures, it is more likely than not that 700 TRUCK owners would have had failures.[27]

The Court concludes that the facts outlined above, and a review of the entire record herein, establishes a *prima*

ant makes out a convincing showing that genuine issues of fact are lacking, we require that the adversary adequately demonstrate by receivable facts that a real, not formal, controversy exists, and, of course, he does not do that by mere denial or holding back evidence." 242 F.2d at 875 (footnotes omitted)).

24. Defendant's Amended Answer to Plaintiff's Interrogatory No. 94. Of this 2,361, General Motors has verified only 153 failures. However, as this Court understands General Motors' verification procedure, for a

failure to be verified, a General Motors investigator must see the failed WHEEL. Of course, many of the owners did not retain their failed WHEELS.

25. Defendant's Opposition to Plaintiff's Motion for Summary Judgment at 33.

26. Altogether, with the assistance of the *amici curiae*, 160 affidavits are on record revealing 436 actual WHEEL failures. These affidavits are attached to the Plaintiff's Motion for Summary Judgment.

27. Deposition of Ralph Morrison at 57, 58.

*facie* case that a "large number of failures" were in fact suffered, thus establishing a safety-related defect.[28]

The next question that the Court must address is whether the defendant has raised a genuine issue of material fact as to the aforementioned considerations.

The defendant did file an affidavit by a Dr. Joskow, a statistician, who concluded, based on information and belief, that the owner affidavits, attached to the government's motion, might be inaccurate because the owners might not recall what it was they experienced and, additionally, because the government personnel assisting in the accumulation of affidavits might be biased thus tainting the information. The Court is unable to conclude that Dr. Joskow's affidavit raises any genuine issue of material fact. Dr. Joskow does not question the methods used to make Dr. Koch's projections, only the *possible* inaccuracies that *might* have arisen due to the methods of accumulating the affidavits. Nowhere in the record is there a hint of any *factual* information indicating that the government affidavits were incorrect or otherwise contained false statements.

■ The second theory strongly urged by defendant in opposition is that the government has not proven a *prima facie* case as to a "large number of failures" on PLAIN TRUCKS. Such proof must be established, defendant contends, since General Motors has already sent out a valid notification with respect to TRUCKS with campers or special bodies.

Although the Court appreciates the effort on the part of defendant in sending out the 1969 letters, the Court is constrained to accept plaintiff's argument that it need not prove a "large number of failures" of WHEELS on PLAIN TRUCKS. It is true that the settlement agreement included a provision that the case could be reopened ·

> [i]f it becomes necessary in the interests of safety, based on further information, such as information as to wheel failures involving trucks on which no camper or special body is attached under clear non-overload conditions.[29]

Defendant contends that this agreement has the effect of limiting plaintiff's proof in any subsequent notification enforcement proceeding to failures on PLAIN TRUCKS.

The Court views the effect of the 1969 letters and the settlement in a different light. The settlement limited the grounds for reopening the case—this is not questioned. However, once it became apparent upon further investigation[30] that there was cause for reopening, the plaintiff was then free to use all available evidence in proving a safety-related defect. In view of the statutory scheme, as this Court interprets the Act, plaintiff was free to show a "large number of failures" by any available means, including a "large number of failures" on all TRUCKS on which failures were evident.

This holding is not unfair to the defendant. The defendant sent out the 1969 letters prior to any formal finding that there was a defect in performance as to all TRUCKS. Once this determination was finalized, defendant was required only to send notifications to owners of TRUCKS not equipped with special bodies or campers and to those TRUCK owners contemplated by the

---

28. The question as to what constitutes a "large number of failures" must necessarily be left to the determination of the Court on the merits of each individual case. The terminology "large" is, of course, relative and on the facts and surrounding circumstances of this action, the Court is convinced that · the number of failures shown must be found to be "large" as a matter of law.

29. See note 10, *supra*.

30. Volume II, Part III of the Agency Investigation Report 16 indicates that 98 WHEEL failures occurred on 47 PLAIN TRUCKS involving a dozen or more injuries to persons.

terms of the October 8, 1969, settlement agreement that did not have their WHEELS replaced in response to the offer.[31]

The facts do establish that there is a safety-related defect in performance. While the settlement agreement was in the public interest and the sending of the letters salutary, those actions cannot be interpreted by this Court to deprive plaintiff of all the proof indicating a safety-related defect on TRUCKS that might have been equipped with special bodies or campers.[32]

## III. CONCLUSION

■ It is the opinion of the Court, therefore, that the uncontradicted evidence establishes that the WHEEL fails unpredictably and catastrophically in large numbers. The affidavits demonstrate the existence of this danger and this danger exists regardless of whether the cause of the failures has been found. It is admitted that the WHEELS fail even following a short period of overloading and it is unnecessary, under this Court's view of the statute, for the government to detail the loading history of each TRUCK and WHEEL.

Therefore, the Court holds that plaintiff has established *de novo* as a matter of law that the WHEELS contain a defect which relates to motor vehicle safety, within the meaning of the Act, in that the WHEELS are subject to sudden and catastrophic failure resulting in accidents and injuries to persons using the highways.

Defendant has presented no evidence negating this proof or sufficient to raise a genuine issue as to there being a large number of failures.

Accordingly, the Secretary of Transportation was warranted in finding, and did not abuse his discretion in so doing, that the WHEELS contain a defect which relates to motor vehicle safety. The Secretary was likewise correct in holding that purchasers of the TRUCKS equipped with the WHEELS are entitled to the notification provided by the Act pursuant to the November 4, 1970, letter.

It appearing to the Court that defendant was directed by the Secretary to furnish the statutory notification, and defendant has failed in compliance, this Court must conclude that plaintiff is en-

31. *See* letter of November 4, 1970, from NHSB to defendant.

32. Although the Court need not reach this question under the "large number of failures" theory, it is apparent that many of these trucks did fail under non-overload conditions. Of the 160 affidavits offered in support of the motion, 40 of the affidavits do not indicate a history of carrying a camper or other special body. (Defendant's Opposition to Plaintiff's Motion for Summary Judgment at 33–34; Affidavit of Jules Joskow, Exhibit D to Defendant's Opposition at ¶ 10). Moreover, of the 153 WHEEL failures verified by General Motors, defendant was able to verify only 95 as having occurred on TRUCKS having campers or special bodies. (Defendant's Opposition to Plaintiff's Motion for Summary Judgment at 19; Affidavit of E. W. Norman, Exhibit F to Defendant's Opposition at ¶ 6). As noted, *supra*, defendant nowhere denies the existence of these failures reported in the 160 affidavits. *See, e. g.,* affidavits of Herman Laeder, William L. Penn, Howard Walker, W. N. George, G. Robert Rohrbach, Robert R. Flick.

Additionally, the fact that the WHEEL was replaced by a similar 15-inch wheel of different design with exactly the same rated carrying capacity leads one to infer that the WHEEL itself has some defect in design or manufacturing, regardless of the load carried. There is some evidence to this effect in the record but it is a matter of dispute inappropriate for summary judgment and included here only as a matter of reflecting the full scope of the record before the Court.

One other point is worthy of mention. General Motors on page 3 of Exhibit 292 to Plaintiff's Request for Admissions states that it installed 311,000 three-piece disc wheels of a design similar to the WHEEL on various 1960–69 model Chevrolet and GMC trucks. These wheels, unlike the WHEEL in controversy here, were *"hot-rolled"* and the record reveals that there were few, if any, reported rim failures on these wheels. This would also lead one to infer that there might have been some defect in the manufacturing process of the cold-rolled WHEEL but, as noted, the Court need not consider this point in reaching the instant decision.

titled, as a matter of law, to summary judgment in this case.

### ORDER

Upon consideration of plaintiff's motion for summary judgment, defendant's opposition thereto, and the entire record herein, and the Court having determined therefrom that the three-quarter ton model year 1960–65 Chevrolet and GMC pickup trucks equippped with three-piece 15 x 5.50 Kelsey-Hayes disc wheels are subject to sudden and catastrophic failure and constitute a safety-related defect within the meaning of Section 113 of the National Traffic and Motor Vehicle Safety Act of 1966 (15 U.S.C. § 1402); and that defendant has violated Sections 113(e)(2) (15 U.S.C. § 1402(e)(2)) and 108(a).(4) (15 U.S.C. § 1397(a)(4)) of that Act by failing and refusing to furnish the notifications specified in Section 113(c) of the Act (15 U.S.C. § 1402(c)) to the purchasers of the aforesaid trucks still equipped with the three piece 15 x 5.50 Kelsey-Hayes disc wheels as provided in Sections 113(a) and (b) thereof (15 U.S.C. § 1402(a) and (b)); and that there is no genuine issue of material fact and, therefore, plaintiff is entitled to a judgment as a matter of law, it is by the Court this 13th day of June, 1974,

Ordered that defendant, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are permanently restrained and enjoined from engaging in further violations of Sections 113(e)(2) (15 U.S.C. § 1402(e)(2)) and 108(a)(4) (15 U.S.C. § 1397(a)(4)) of the Traffic Safety Act by failing and refusing to furnish the notifications specified in Section 113(c) of the Act (15 U.S.C. § 1402(c)) to the purchasers of the three-quarter ton 1960–65 model year Chevrolet and GMC pickup trucks presently equipped with the three-piece 15 x 5.50 Kelsey-Hayes disc wheels as provided in Section 113(a) and (b) of the Act (15 U.S.C. § 1402(a) and (b)) and

as outlined in the accompanying Opinion; and it is further

Ordered that defendant's counterclaim be, and the same hereby is, dismissed; and it is further

Ordered that any determination as to defendant's liability for a civil penalty of $400,000 be held in abeyance until the parties have had the opportunity to submit memoranda in this regard, plaintiff's memoranda to be submitted within 14 days of the issuance of this Order and defendant's memoranda 14 days thereafter.