**The UNITED STATES of America,
Plaintiff,**

**v.**

**GENERAL MOTORS CORPORATION,
Defendant.**

**GENERAL MOTORS CORPORATION,
Plaintiff,**

**v.**

**Claude S. BRINEGAR, as Secretary of
Transportation, et al., Defendants.**

**Civ. A. Nos. 74–277 and 74–1053.**

United States District Court,
District of Columbia.

Oct. 16, 1974.

Jeffrey Axelrad, Atty., Dept. of Justice, Washington, D. C., for plaintiff United States of America.

James J. Robertson, Washington, D. C., for General Motors.

## MEMORANDUM

GASCH, District Judge.

This matter is before the Court on cross-motions for summary judgment and oppositions thereto.[1]

The action arises under Title I of the National Traffic and Motor Vehicle Safety Act of 1966, as amended (Act of September 9, 1966, 80 Stat. 718 et seq., 15 U.S.C. § 1381 et seq.) (hereinafter referred to as the Act). General Motors (hereinafter referred to as GM) is a corporation organized under the laws of Delaware and is a "manufacturer" within the meaning of Section 102(5) of the Act (15 U.S.C. § 1391(5)).

## I. FACTUAL BACKGROUND.

During the period which encompassed model years 1959 through 1960, GM manufactured and sold approximately 284,456 Cadillac automobiles. GM estimates that approximately 43,400 are still in use.[2]

On September 13, 1972, some twelve years later, the Center for Auto Safety, Washington, D. C., forwarded to the Office of Defects Investigation, National Highway Traffic Safety Administration (hereinafter referred to as NHTSA) [3] information alleging the existence of a safety-related defect in the design and performance of the steering pitman arm in the 1959–1960 model year Cadillacs.[4] The pitman arm is a critical component of the steering system. It connects the steering shaft to the steering linkage. If it fails, directional control of the vehicle is lost.

NHTSA initiated an investigation of the pitman arm which included tests, interviews with a representative group of vehicle owners who had complained of failures, submissions from GM which disclosed an unusually large number of replacements of pitman arms, and a hearing conducted on November 6,

1. The Court has granted leave for Stanton R. Koppel of the Center for Auto Safety, Washington, D. C., to file a memorandum as *amicus curiae*.

2. Affidavit of Alexander I. Pirie, Manager, Analysis, Product Assurance Department, Environmental Activities Staff, GM, August 2, 1974, ¶ 2.

3. The Director acts pursuant to the authority delegated to him by the Secretary of Transportation. 49 C.F.R. § 1.51.

4. The term, "pitman arm," refers to the steering pitman arm on the 1959–1960 model year Cadillac unless otherwise stated.

1973.[5] As a result of this investigation, NHTSA, acting pursuant to Section 113(e) of the Act (15 U.S.C. § 1402(e))

> determined that a defect which relates to motor vehicle safety exists with respect to the steering pitman arm on 1959–1960 model year Cadillac automobiles, in that these pitman arms are subject to sudden and catastrophic failure, causing loss of steering control, and resulting in an unreasonable risk of accidents, deaths, and injuries to persons using the highways.[6]

By letter dated January 10, 1974, NHTSA directed GM to furnish the notification specified in Section 113(c) of the Act (15 U.S.C. § 1402(c)) to the purchasers of these automobiles.

On January 11, GM filed a suit in the U.S. District Court for the Eastern District of Michigan (G.M. v. Brinegar, et al., Civ.A. No. 4–70939) seeking a declaration that the agency determination was unlawful and void and an injunction resisting enforcement of the agency's order. GM obtained a temporary restraining order. On February 13, GM's motion for a preliminary injunction was denied and the temporary restraining order vacated by the Michigan Court. On that same day the United States (hereinafter referred to as US)

filed a suit in this Court (U.S. v. G.M., Civ.A. No. 74–277) to enforce NHTSA's order under Section 110(a) of the Act (15 U.S.C. § 1399(a)).[7] The Michigan action for declaratory relief and an injunction was transferred to this Court on July 8 (as Civ.A. No. 74–1053). GM has yet to furnish the notifications to purchasers as ordered by NHTSA.

## II. SUMMARY JUDGMENT.

### (a) Defect.

On March 5 the US moved for summary judgment on the basis of the Administrative Record. This record contains data supplied by GM [8] which shows that roughly 9.3% (26,424) pitman arms were subject to replacement for the 1959–1960 model year Cadillacs. This compares with a 1.68% (4,519) replacement rate for the 1957–1958 model, and a 1.48% (4,423) replacement rate for the 1961–1962 model. The design of the pitman arm for the year in question differs from the previous year's design as well as that of the following year. GM is unable to provide a reason for the difference in replacement rates.[9]

The US contends that this unusually high replacement rate constitutes *prima facie* proof that the pitman arm contains a defect. The US bases this argu-

---

5. All of these items are contained in the extensive Administrative Record and its Supplement.

6. Letter dated January 10, 1974, from James B. Gregory, Administrator, NHTSA, to E. M. Cole, President, GM, Administrative Record, Exhibit S–34, p. 2.

7. Additionally the US seeks $400,000 in civil penalties from GM pursuant to Section 109 (a) (15 U.S.C. § 1398(a)) for failure to issue the safety defect notifications. The Court does not decide this at this time.

8. Administrative Record, Exhibit 2, Figure 11, September 26, 1972. Figures submitted June 20, 1974, in GM's August 5 memorandum of opposition to motion for summary judgment are slightly higher.

 GM emphasizes that these figures reflect *sales* of pitman arms to dealers, not installa-

tions on automobiles. *See* Affidavit of Loren R. Papenguth, Assistant Chief Engineer for Cadillac Motor Car Division of GM, August 2, 1974, ¶ 7. The Court believes it is safe to assume that these parts were not purchased by dealers to sit on their shelves.

 GM further suggests that pitman arm replacement may have occurred for reasons other than fatigue-induced failure: improper lubrication and maintenance, hard usage creating excessive ball stud wear, excessive loads due to improper torquing techniques, hoist damage, accident damage, and precautionary measures taken by dealers. The Court does not think these other reasons can by themselves account for such an unusually high replacement rate.

9. Statement of L. R. Papenguth at the administrative hearing on November 13, 1973. Administrative Record, Exhibit S–24, pp. 37–38.

ment on the WHEELS case (United States v. G.M., D.C., 377 F.Supp. 242), decided by this Court on June 13, 1974, in which we held that a large number of failures of 15 x 5.50 Kelsey-Hayes disc wheels constitutes *prima facie* proof of the existence of a defect in performance under Section 102(11) of the Act (15 U.S.C. § 1391(11)). The US seeks to carry that decision one step further in this case.

As will become apparent, this case is clearly distinguishable from WHEELS. In WHEELS there was no controversy between the US and GM over whether there existed a large number of failures; in this case there is such a controversy. In WHEELS there was no dispute over whether such failure constituted an unreasonable risk of accidents, death or injury; that *is* the dispute in this case. In WHEELS the primary questions were the interpretation of the statutory words, "defect in performance" and what proof is necessary to show a defect in performance; in this case, which is a case of first impression, the primary questions are the interpretation of the statutory words, "unreasonable risk" and what proof is necessary to show that a defect poses an unreasonable risk of accidents, death or injury.

The Administrative Record also contains the results of tests conducted for NHTSA by the Essex Corporation of Alexandria, Virginia, a private testing corporation under contract to NHTSA. These tests confirmed information supplied by GM [10] that the pitman arm can fail from metal fatigue after a large number of high stress maneuvers such as occur in parking and turning.[11] According to the US, either the report of the tests or the high replacement rate is sufficient to prove a defect in design

or performance under Section 113(e) (2) of the Act (15 U.S.C. § 1402(e)(2)).

The Court does not reach the question of whether an unusually high replacement rate is *prima facie* proof under the Act of the existence of a defect. The test results are sufficient to indicate such a defect. Whether this is a defect which relates to motor vehicle safety is a more difficult question.

### (b) Unreasonable Risk.

The Act is not concerned with all defects, but only with "a defect which relates to motor vehicle safety" (Section 113(e)(2), 15 U.S.C. § 1402(e) (2)). It defines "motor vehicle safety" in Section 102(1) (15 U.S.C. § 1391(1)) as

> the performance of motor vehicles or motor vehicle equipment in such a manner that the public is protected against *unreasonable risk of accidents* occurring as a result of the design, construction or performance of motor vehicles and is also protected against *unreasonable risk of death or injury* to persons in the event accidents do occur . . .. (Emphasis added.)

The US relies for summary judgment on the logical assumption that a defect involving the steering mechanism which leads to a loss of directional control creates an unreasonable risk of accidents, death or injury at any speed. It points to the fact that 10.7% of all fatal accidents occur at speeds of less than 20 miles per hour, and over 34.2% of all accidents resulting in injuries occur within this speed range.[12]

GM replies that fatigue-induced failure in the pitman arm constitutes no risk to safety because failure can occur only when the wheels are turned to or nearly to their extreme limits.[13] This condition is reached only in parking or

---

10. Administrative Record, Exhibit 6.

11. Administrative Record, Exhibit 15.

12. This data is taken from the 1972 edition of "Accident Facts" published by the National

Safety Council, Chicago, Illinois, and is in the Administrative Record, p. 17.

13. Papenguth Affidavit, ¶ 8.

turning at very slow speeds, when loss of directional control can be checked by braking, or when the automobile is standing virtually still.

To substantiate this contention GM recounts its history of the 1959–1960 model year Cadillacs: 24 billion miles traveled; 144 reported incidents alleging pitman arm failure, only 19 of which included accidents, and none of which resulted in personal injury or death.[14] If summary judgment is to be granted on the basis of the Administrative Record, argues GM, it should be granted in favor of GM's motion since the record demonstrates that pitman arm failure is not an unreasonable risk.

The US disputes GM's figures and alleges a larger number of pitman arm failures, including at least one occurrence at high speed.[15] The figures of both sides are ambiguous, however, because they are based primarily on consumer complaints, many of which were submitted long after the alleged pitman arm failures. There was never opportunity for NHTSA to examine a defective pitman arm to determine whether it had failed from metal fatigue, and, if there was an accident associated with the alleged failure, whether pitman arm failure was its cause.

 The figures may be ambiguous, but the law is clear that summary judgment can be granted only if "there is no genuine issue as to any material fact." Rule 56(c), Fed.R.Civ.P. The moving party has the burden of demonstrating the absence of any genuine

issue of material fact. Semaan v. Mumford, 118 U.S.App.D.C. 282, 283, 335 F.2d 704, 705 (1964). The party opposing summary judgment "is entitled to the benefit of all favorable inferences that may reasonably be drawn from the evidence for the purpose of defeating summary judgment." Semaan v. Mumford, *supra, quoting* 6 Moore, Federal Practice 2114 (2d ed. 1953). To defeat a summary judgment motion, the opposing party need not prove that the factual inferences drawn by the moving party are actually incorrect; it is enough for the opposing party to show that contrary inferences "might be permissible." United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam). These principles have been consistently followed by the United States Supreme Court [16] and by the United States Court of Appeals for this Circuit.[17] If material facts are found to be in dispute a motion for summary judgment must be denied and a trial held.[18]

### III. CONCLUSIONS.

There is a certain appeal to the government's argument that a defect which may result in a loss of steering control is, *ipso facto,* a safety-related defect under the Act. One need only ask whether he would consider loss of steering control, even at a very slow speed, a reasonable or unreasonable risk.

 The Act is more limited, however. Under its standard, a safety-related defect must pose, not just a

14. Papenguth Affidavit, ¶¶ 4, 5, 6. Mr. Papenguth maintains that in 17 of the 19 alleged accidents there is no evidence of pitman arm failure.

15. Administrative Record, p. 7, and Exhibit 9, Zanfardino report.

16. United States v. Diebold, Inc., *supra.* Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

17. Rodway v. United States Dep't of Agriculture, 157 U.S.App.D.C. 133, 138, 482 F.2d 722, 727 (1973); Bloomgarden v. Coyer,

156 U.S.App.D.C. 109, 114–115, 479 F.2d 201, 206–207 (1973); Nyhus v. Travel Management Corp., 151 U.S.App.D.C. 269, 271, 466 F.2d 440, 442 (1973); Washington v. Cameron, 133 U.S.App.D.C. 391, 395–396, 411 F.2d 705, 709–710 (1969); Underwater Storage, Inc. v. United States Rubber Co., 125 U.S. App.D.C. 297, 300, 371 F.2d 950, 953 (1966), cert. denied, 386 U.S. 911, 87 S.Ct. 859, 17 L.Ed.2d 784 (1967); Semaan v. Mumford, *supra.*

18. This is not a case of review of an administrative record.

risk of accidents, death or injury, but an *unreasonable* risk. The inclusion of the adjective "unreasonable," as well as the legislative history [19] make the question of whether fatigue induced failure of the pitman arm creates such an unreasonable risk a matter of fact, not of supposition. The US says pitman arm failure can occur at high speeds but is an unreasonable risk at any speed; GM says pitman arm failure cannot occur at high speeds and does not pose an unreasonable risk at slow speeds. This is an issue of fact which cannot be resolved by logic alone. And it is an issue of material fact under the law of summary judgment. Therefore, the government's motion for summary judgment will be denied.

On this factual issue the automobile's road history is enlightening but not conclusive. For one thing, the history itself is a matter of dispute between the parties. Even more important, the

19. During the hearings on this bill before the Senate Committee on Commerce, Senator Ribicoff, testifying in support of the bill, raised the question of how strict the standards to be promulgated by the Secretary [of Commerce] would be. This discussion followed:

> Senator Pastore (a member of the Committee) : Abe, I quite agree with you, and this requires more commonsense and it will not cost much more money. There is no question about that. But we are discussing here the technicalities and guidelines and formulas that we have to put in words to give guidance to the Secretary of Commerce so that he knows what his limits are, to promote this commonsense that we are talking about. And that is where I think we are going to have a tremendous amount of difficulty.
>
> I think we are all agreed now, we are all agreed, that heretofore we haven't concentrated enough thought on this question of safety, and who is primarily responsible.
>
> You are developing today the thesis that in the past the automobile industry could have done a whole lot more, and had they done it, we wouldn't be confronted with this legislation today.
>
> Now we are giving this authority to the Secretary of Commerce. And we have to tell him, as a committee and as a Congress, how far he can go and how far he can't go. And that is where we are going to have trouble.

> Senator Ribicoff: It is complex. In addition to the Secretary of Commerce, I think you can call upon the men who have been working in this field at Harvard, Cornell, and UCLA. And I think the automobile industry should be called in to explain the impact that standards will have on them and how this will work out. I think you should have testimony from the GSA.
> Senator Magnuson (chairman of the Committee) : GSA is going to testify tomorrow, and the automobile industry later.

> May I say at this point, and it might throw a little light on this, section 101 of the bill says :
> (He reads Section 101 of the Senate bill, S. 3005, which became Section 102(1) of the Act, 15 U.S.C. § 1391(1), quoted above, p. 118 of this Memorandum.)
> The reason the word "unreasonable" was put in there is that we hope there will be some commonsense applied to this, such as the Senator from Rhode Island (Pastore) has pointed out.

Hearings on S. 3005 Before the Senate Committee on Commerce, 89th Cong., 2d Sess., ser. 89–49, at 56 (1966).

Although this discussion related to promulgation of standards under Section 103 of the Act (15 U.S.C. § 1392), the Court finds that this "commonsense" approach is intended to be applied to the Act as a whole.

It is significant in this regard that Section 103(f)(3) requires reasonableness in prescribing standards: The Secretary shall consider, among other things,

> whether any such proposed standard is reasonable, practicable and appropriate for the particular type of motor vehicle or item of motor vehicle equipment for which it is prescribed.

The General Counsel of the Commerce Department stated in a letter to the Senate Commerce Committee:

> The tests of reasonableness of cost, feasibility and adequate lead time should be included among those factors which the Secretary could consider in making his total judgment.

The Committee Report to the Senate quotes this portion and says,

> The committee intends that safety shall be the overriding consideration in the issuance of standards under this bill. The committee recognizes, as the Commerce Department letter indicates, that the Secretary will necessarily consider reasonableness of cost, feasibility and adequate lead time.

S.Rep.No.1301, 89th Cong., 2d Sess. 6 (1966).

Act looks less to the past than to the future. Its purpose is "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." (Section 1, 15 U.S.C. § 1381). It seeks to prevent accidents before they occur; that is the function of the statutory defect notification program. Whether fatigue-induced failure of the pitman arm creates an unreasonable risk depends upon, among other things, whether failure can occur at high speeds. The Administrative Record, which looks retrospectively at GM's road history of this automobile, is insufficient to settle this dispute. Therefore, GM's motion for summary judgment will be denied.