UNITED STATES of America

v.

GENERAL MOTORS CORPORATION,
a corporation, Appellant.

No. 74–1656.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 21, 1974.

Decided Aug. 4, 1975.

Lloyd N. Cutler, Washington, D. C., with whom Timothy B. Dyk, C. Boyden Gray and Ronald J. Greene, Washington, D. C., were on the brief for appellant.

Nathan Dodell, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., was on the brief for appellee. Arnold T. Aikens, Asst. U. S. Atty., also entered an appearance for appellee.

Bruce L. Montgomery, Washington, D. C., with whom Michael N. Sohn and Charles R. Halpern, Washington, D. C., were on the brief for Ralph Nader et al., as amici curiae urging affirmance.

Before TAMM and LEVENTHAL, Circuit Judges, and MERHIGE,* United States District Judge for the Eastern District of Virginia.

LEVENTHAL, Circuit Judge:

This case represents the first appellate examination of the defect notification provisions of the National Traffic and Motor Vehicle Safety Act of 1966.[1]

The Government filed an action in the District Court for a declaration that General Motors Corporation (GM) violated this Act by failing to notify purchasers of ¾ ton 1960–65 model year Chevrolet and GMC pickup trucks (Trucks) equipped with three-piece 15 × 5.50 Kelsey-Hayes disc wheels (Wheels) of a defect in the Wheels relating to motor vehicle safety. The District Court concluded that a "defect" existed whenever there was "a large number of failures of components or materials, i. e., failures in performance, regardless of the cause."[2] Finding that undisputed facts established a large number of Wheel failures, the District Court granted the Government's motion for summary judgment and ordered GM to issue defect notifications as required by the Act.[3] GM appeals this determination, particularly challenging this definition of "defect."

■ This case focuses on the meaning of § 113 of the Act, set forth in pertinent part in the margin.[4] The statutory

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d)

1. Act of September 9, 1966, 80 Stat. 718, 15 U.S.C. § 1381 et seq. (1970). Minor amendments to the Act passed in 1970 did not alter materially the provisions relevant to this case. The Motor Vehicle and Schoolbus Safety Amendments of 1974 replaced § 113 of the 1966 statute, as amended 15 U.S.C. § 1402 (1970), with new §§ 151–60. 88 Stat. 1470. *See* note 72 *infra*.

As of March 1, 1975, three other defect notification enforcement actions had been commenced. United States v. General Motors, No. 74–277, 65 F.R.D. 115 (D.D.C. 1974) (denying the Government's motion for summary judgment in a case involving steering pitman arm failures in 1959–60 model year Cadillacs); United States v. General Motors, No. 75–49 (D.D.C., filed Jan. 13, 1975) (involving quadrajet carburetors on 1965–66 model year Chevrolets and 1966 model year Buicks); United States v. General Motors, No. 75–50 (D.D.C., filed Jan. 13, 1975) (involving engine mounts on certain 1970 Cadillacs and certain 1965–68 Buicks).

2. United States v. General Motors, 377 F.Supp. 242, 249 (D.D.C.1974) (emphasis in original).

3. *Id.* at 251, 254.

4. Section 113 of the Act, 15 U.S.C. § 1402 (1970), stated in pertinent part:

§ 1402. *Discovery of defects by manufacturer.*

(a) *Notice to purchaser.*

Every manufacturer of motor vehicles or tires shall furnish notification of any defect in any motor vehicle or motor vehicle equipment produced by such manufacturer which he determines, in good faith, relates to motor vehicle safety, to the purchaser (where known to the manufacturer) of such motor vehicle or motor vehicle equipment, within a reasonable time after such manufacturer has discovered such defect.

(b) *Notification by certified mail.*

The notification required by subsection (a) of this section shall be accomplished—

(1) by certified mail to the first purchaser (not including any dealer of such manufacturer) of the motor vehicle or motor vehicle equipment containing such a defect, and to any subsequent purchaser to whom has been transferred any warranty on such motor vehicle or motor vehicle equipment; and

(2) by certified mail or other more expeditious means to the dealer or dealers of such manufacturer to whom such motor vehicle or equipment was delivered.

(c) *Form and requisites of notification.*

The notification required by subsection (a) of this section shall contain a clear description of such defect, an evaluation of the risk to traffic safety reasonably related to such defect, and a statement of the measures to be taken to repair such defect.

* * * * * *

(e) *Notice by Secretary to manufacturer concerning defects relating to motor vehicle safety or failure to comply with safety standards; presentation of opposing views; notice to purchasers of defects.*

If through testing, inspection, investigation, or research carried out pursuant to this subchapter, or examination of reports pur-

framework places primary responsibility on the manufacturer to notify purchasers of "any defect in any motor vehicle or motor vehicle equipment produced by such manufacturer which he determines, in good faith, relates to motor vehicle safety." The manufacturer may base his defect determination on his own studies, information supplied by purchasers and dealers, or the Secretary of Transportation's finding that the equipment "contains a defect." [5] Judicial involvement in the defect notification process takes place only in cases where the Secretary, after affording the manufacturer an opportunity to present its views, reaffirms his defect determination by directing the manufacturer to issue notices and the manufacturer continues to challenge the finding by refusing to comply. In such cases, the Government may bring an action in United States district court to restrain the manufacturer's violation of the directive.[6] The District Court enforcement proceeding affords the manufacturer a trial *de novo* with the burden of proof on the Government to establish the existence of a safety-related defect.[7]

The primary question presented by this appeal is whether the District Court erred in concluding that undisputed proof of a large number of Wheel failures conclusively established a "defect" within the meaning of the Act, and that the cause of such failures was immaterial. GM contends that no defect exists unless a significant number of failures occur in vehicles operated in conformity with the manufacturer's specifications. Specifically, GM argues that the Wheel failures were a product of owner abuse—overloading the Trucks with heavy campers or special bodies—and that the Wheels are suitable for uses that comply with the weight limitations set forth in the owner's manual. Alternatively, GM asserts that prior letters sent to owners describing the dangers created by overloading Trucks equipped with the Kelsey-Hayes wheels comply with the requirements of the Act and constitute a defense against the present enforcement action.

■ Our survey of the Act's purpose and legislative history leads us to reject

suant to subsection (d) of this section, or otherwise, the Secretary determines that any motor vehicle or item of motor vehicle equipment—

(1) does not comply with an applicable Federal motor vehicle safety standard prescribed pursuant to section 1392 of this title; or

(2) contains a defect which relates to motor vehicle safety;

then he shall immediately notify the manufacturer of such motor vehicle or item of motor vehicle equipment of such defect or failure to comply. The notice shall contain the findings of the Secretary and shall include all information upon which the findings are based. The Secretary shall afford such manufacturer an opportunity to present his views and evidence in support thereof, to establish that there is no failure of compliance or that the alleged defect does not affect motor vehicle safety. If after such presentation by the manufacturer the Secretary determines that such vehicle or item of equipment does not comply with applicable Federal motor vehicle safety standards, or contains a defect which relates to motor vehicle safety, the Secretary shall direct the manufacturer to furnish the notification specified in subsection (c) of this section to

the purchaser of such motor vehicle or item of motor vehicle equipment as provided in subsections (a) and (b) of this section.

This section was amended in 1970 and replaced in 1974 with new provisions governing defect notification and correction. *See* note 1 *supra.* The 1974 provisions retained the basic structure and approach of the 1966 section and expanded the obligations placed on manufacturers.

5. The Secretary has delegated the authority to carry out the Act to the National Highway Traffic Safety Administration (formerly the Director of the National Highway Safety Bureau). 49 C.F.R. § 1.51(a) (1974).

6. Section 110(a), 15 U.S.C. § 1399(a) (1970), provides that the United States district courts shall have jurisdiction to restrain violations of the Act. This case involves an alleged violation of § 108(a)(4), 15 U.S.C. § 1397(a)(4) (1970), which prohibits persons from failing to furnish notification of any defect as required by § 113). Section 109, 15 U.S.C. § 1398 (1970), provides for civil penalties for violations of § 108.

7. *See* United States v. General Motors, 377 F.Supp. 242, 250 (D.D.C.1974); H.R.Rep.No. 1191, 93d Cong., 2d Sess. 17 (1974), U.S.Code Cong. & Admin.News 1974, p. 6052.

both the definition of defect urged by the Government and adopted by the District Court and the definition put forth by GM. We find that a vehicle or component "contains a defect" if it is subject to a significant number of failures in normal operation, including failures either occurring during specified use or resulting from owner abuse (including inadequate maintenance) that is reasonably foreseeable[8] (ordinary abuse), but excluding failures attributable to normal deterioration of a component as a result of age and wear. Whether a defect exists in a particular case thus turns on the nature of the component involved, the circumstances in which the failures occurred, and the number of failures experienced. Where, as here, the component is designed to function without replacement over the lifetime of the vehicle,[9] the Government may discharge its burden of establishing a defect by showing a significant number of failures without making any showing of cause. But in all cases the manufacturer may prove, as an affirmative defense, that the failures resulted from unforeseeable owner abuse (gross abuse) or unforeseeable neglect of vehicle maintenance.

■ This view of the legislative contemplation leads us to conclude that the District Court's grant of summary judgment must be reversed, because there are presently genuine issues of material fact regarding GM's defense that the Wheel failures stem from unforeseeable overloading of the Trucks.

## I. BACKGROUND

We begin with a brief description of the vehicle component involved in this case, the administrative proceedings culminating in the present enforcement action, and the proceedings in the District Court.

### A. The Kelsey-Hayes Wheel

The three-piece $15 \times 5.50$ Kelsey-Hayes disc wheel was introduced by GM in the fall of 1959, the beginning of the 1960 model year, as an option on its ¾ ton Chevrolet Series 20 and GMC Series 1500 pickup trucks. The Wheels proved to be an extremely popular option—a total of 810,000 Wheels were installed on approximately 200,000 of the 321,743 GM trucks manufactured during the 1960–65 model years.[10] This popularity apparently stemmed from the fact that the Wheel could be used with a tube-type tire capable of being changed in the field.[11]

The load carrying capabilities of the trucks equipped with Kelsey-Hayes wheels depended on which of three different tube tires was selected by the purchaser. The maximum load capacity of a truck is its gross vehicle weight (GVW)—the sum of the curb (empty) weight of the truck itself and the maximum load. The gross vehicle weights of Trucks here involved ranged from 5,500 lbs. with $700 \times 15$ 6-ply tires, to 6,000 lbs. with $700 \times 15$ 8-ply tires, and 6700 lbs. with $7.50 \times 15$ 8-ply tires. While the maximum load capacity of the Kel-

---

8. We use the term "reasonably foreseeable" to refer to the expected range of use in actual general operation. *See* note 88 *infra*. For a discussion of the standard for establishing a defect see text at notes 84–89 *infra* and notes 84–89 *infra*.

9. *See* Transcript of April 11, 1969, Meeting at 34 (statement of Alex C. Mair, Director of Engineering, Chevrolet).

10. *See* Letter from J. C. Bates, Director, GM Service Section, to Rodolfo Diaz, Associate Director for Motor Vehicle Programs, National Highway Safety Bureau, Sept. 29, 1970, at 6. Other estimates of the number of Trucks equipped with Kelsey-Hayes wheels ranged from 170,000 to 217,000. *See* Transcript of

May 22, 1969, Meeting at 184, 185 (statement of E. M. Estes, GM Vice-President in Charge of Car and Truck Group); Affidavit of James T. Riley (of General Motors) at 8, JA 181.

11. *See* Affidavit of James T. Riley at 8, JA 182. This feature and the small 15″ diameter of the Wheel, which permitted camper bodies to sit closer to the ground for easier entry, appealed to camper owners. *See* Brief for Appellant at 7. According to GM estimates, campers were installed on 20,000 Trucks; and either campers or special bodies were installed on approximately 50,000 of the 200,000 Trucks equipped with Wheels. *See* Letter, *supra* note 10, at 6; Affidavit of James T. Riley at 10, JA 183–84.

sey-Hayes wheel was 2060 lbs., the tire-wheel capacity, combining the Wheel with the tires identified in the previous sentence, was 1520 lbs., 1800 lbs., and 2060 lbs., respectively.[12] The GVW of the Trucks is thus significantly less than the figure obtained by multiplying the tire-wheel capacity by four. This deviation from a simple multiple of the tire-wheel capacity stems in part from the manner in which load weights are distributed between the front and rear wheels.

Each Truck came with a permanently affixed GVW plate stating that the maximum GVW rating was 7500 lbs. This 7500 lb. figure on the plate is in excess of the 5500 lb. GVW of Trucks with the standard wheel and tire, available without extra charge,[13] and in excess of the GVW of Trucks with the Kelsey-Hayes optional wheel (which ranged from 5500 to 6700 lbs.).

Information on the tire-wheel capacity of particular tire-wheel combinations was set forth in the owner's manual in a table marked "Tire Inflation Tables for Highway Service." Also in the owner's manual was a table listing gross vehicle weights, referred to in some manuals as "load capacity chart." This table listed gross vehicle weights for various combinations of tires for front and rear wheels (sometimes with notations of necessary equipment such as heavy duty springs). However, this table did not show gross vehicle weight for any of the 15-inch tires used with the Kelsey-Hayes wheels.[14]

General Motors discontinued the Wheel as an available option at the end of the 1965 model year.[15]

B. *Administrative Proceedings*

A September 4, 1968, letter from Ralph Nader, the noted exponent of consumer causes, reported an injury-producing accident caused by the failure of a Kelsey-Hayes wheel. This prompted the National Highway Safety Bureau (NHSB) (now the National Highway Traffic Safety Administration) to initiate an investigation to determine whether the Wheel contained a safety-related defect.[16] General Motors indicated, in response to NHSB inquiries, that its records revealed 53 Wheel failures.[17] GM disputed NHSB's engineering reports which suggested a manufacturing defect, stating that its engineers had determined that the failures "were not caused by a defect but rather by the type of loading to which the wheels were subjected."[18] Part I of NHSB's Investigation Report, dated April 2, 1969, concluded that "[s]afety-related defects still exist in 15 × 5.5 three-piece disc wheels which are in active use" and recommended that "all such wheels" be "replaced as early as possible."[19]

Following the completion of the initial investigation, meetings were held between NHSB personnel and GM representatives. Although persisting in its claim that there was no defect and therefore no obligation under the Act to issue notifications, GM advised the agency on April 19, 1969, of its plans to notify each owner of a truck equipped with Kelsey-Hayes wheels of the dangers

---

12. *See* Affidavit of James T. Riley at 7, JA 180.

13. *See id.* The tire-wheel combination available without charge was the 17.5 × 5.25 disc, 1-piece wheel, with a 7.00 × 17.5 6-ply tire.

14. *See* Part II, Investigation Report Involving Alleged Wheel Failures, Chevrolet and GMC Trucks, NHSB, Aug. 12, 1969, at 9, 18–19; notes 126–28 and accompanying text *infra*. Tables from the 1960–65 owners manuals are set forth at JA 255–72.

15. *See* Affidavit of James T. Riley at 10, JA 183.

16. *See* Part I, Investigation Report Involving Alleged Wheel Failures, Chevrolet and GMC Trucks, NHSB, Apr. 2, 1969, at 3.

17. Letter from J. C. Bates to Dr. Robert Brenner, Acting Director, NHSB, Mar. 21, 1969, at 1.

18. Letter from J. C. Bates to Francis Armstrong, Director, Office of Performance Analysis, NHSB, Oct. 15, 1968, at 1.

19. *See* Part I, Investigation Report, *supra* note 16, at 5.

posed by overloading and overinflating tires. The proposed bulletin included a table specifying the maximum weight and tire pressure for each of the three tires used with the Wheel.[20] A draft of the letter was hammered out at a May 22, 1969, meeting of Government and GM personnel, and, beginning on May 28, notices were sent to 280,000 truck owners.[21]

Part II of NHSB's Investigation Report, dated August 12, 1969, reaffirmed the agency's earlier findings and recommendations. It rejected GM's overloading theory, finding that "96 percent of all known wheel failures have occurred under loads which are below the design wheel strength level specified" by GM and that metallurgical analyses indicated manufacturing defects. In addition, the report concluded that the May 28 bulletin was deficient.[22] On August 22, 1969, the Federal Highway Administrator informed GM that "the present state of the record" demonstrates that "a defect which relates to motor vehicle safety exists" and notified GM that it would have an opportunity to present its views and supporting evidence in accordance with Section 113(e) of the Act.[23] At a meeting held September 12, 1969, GM submitted a written statement of its position and summarized its major points in an oral presentation.

Prior to a ruling by the Administrator in the defect proceeding, GM submitted a settlement offer. By letter of October 3, 1969, GM proposed "as a matter of customer relations" to send a second bulletin warning owners about proper loading and tire inflation and offering to replace, at GM's expense, the three-piece Kelsey-Hayes wheels on those trucks— estimated at 50,000 in number—on which campers or other special bodies had been installed by the owners. The settlement offer set forth GM's understanding that its proposed action would moot the pending defect proceeding with the result that the investigation would be closed "immediately" and "not be subject to reopening."[24] The NHSB accepted GM's proposal on October 8, 1969, but expressly reserved the right to take further action "in the interests of safety."[25] As of May 1974, approximately 66,270 Wheels had been replaced by GM under its offer.[26]

In November, 1969, Secretary of Transportation Volpe, in response to a letter written by Ralph Nader criticizing the settlement, stated that NHSB was carrying forward its survey of the plain trucks (not equipped with campers or special bodies)—estimated at 150,000 in number—to determine whether corrective measures were indicated.[27] In an attempt to spur agency action, *amici curiae* in this case, Ralph Nader, et al., filed an action on March 31, 1970, against Secretary Volpe and others seeking to compel reconsideration of whether

**20.** Letter from J. C. Bates to Dr. Robert Brenner, April 19, 1969, at 8.

**21.** Although NHSB officials believed that the Wheels contained a defect, they did not press the point in the negotiations over the letter because of the urgent need to provide some warning to owners before the upcoming summer camping season. Transcript of May 22, 1969, Meeting at 159–60 (statement of Francis Turner, Federal Highway Administrator). The letter is set forth in App. C of Appellant's brief.

**22.** *See* Part II, Investigation Report, *supra* note 14, at 2, 21–22. NHSB used a wheel strength level of 2369 lbs. derived from representations by GM officials that the Wheel would accommodate a reasonable overload of 15 percent. *Id.* at 13.

**23.** Letter from E. H. Holmes, Acting Federal Highway Administrator, to E. N. Cole, President of General Motors Corp., Aug. 22, 1969, at 2.

**24.** Letter from J. C. Bates to Francis C. Turner, Oct. 3, 1969, at 1, 2.

**25.** Letter from Francis C. Turner to J. C. Bates, Oct. 8, 1969, *quoted in* Brief for Appellant at 10.

**26.** *See* Transcript of Proceedings, May 22, 1974, at 19. The October, 1969, bulletin is set forth in Appendix D of Appellant's brief.

**27.** *See* Department of Transportation Press Release of Nov. 3, 1969, at 2 and attached letter to Ralph Nader.

there was a safety-related defect in Kelsey-Hayes wheels installed on plain trucks.[28] On June 26, 1970, Judge Waddy issued an order remanding the matter to the NHSB with instructions to continue its investigation and report to the court by September 17, 1970.

Two weeks before its progress report was due, the agency completed Part III of its Investigation Report. This report found that there were 98 known failures on plain trucks and contended that "[a] significant number of wheel failures has occurred on [plain] trucks . . . under loads which are below wheel strength level specified" by GM.[29] NHSB provided GM with a copy of the report and advised GM of its right to present its position to the agency on September 30. At the meeting, GM rested on a twenty-four page memorandum which argued that the failure data contained in Part III of the Investigation Report were unreliable and that metallurgical conclusions in Parts I and II were "absolutely unfounded."[30] After evaluating the evidence in the record, the Director of NHSB found the Wheels defective because they "are subject to sudden and catastrophic failures resulting in an unreasonable risk of accident, death, and injuries to persons using the highways." By letter of November 4, 1970, he directed GM, pursuant to § 113(e) of the Act, to furnish § 113(c) defect notifications to owners of Trucks which had not had their Wheels replaced under the October 8, 1969, settlement offer.[31]

On the same day, GM filed an action in the United States District Court for the District of Delaware seeking injunctive and declaratory relief with respect to the NHSB's directive. Two days later, on November 6, 1970, the Government brought the present enforcement action in the United States District Court for the District of Columbia. GM's pre-enforcement action in Delaware was dismissed, and GM was remitted to presenting its challenges as defenses to the Government's enforcement action.[32]

## C. Proceedings in the District Court

Shortly after the Government filed its enforcement action, GM moved to dismiss, transfer, or stay further proceedings in view of the pre-enforcement action it had filed in Delaware. As a result of delay attributable to the jurisdictional question, defendant did not file its answer until February 3, 1971, and discovery did not commence until April. Following more than a year of extensive discovery by both parties, the Government moved for summary judgment on July 12, 1972. The Government's motion rested on the theory that a defect could be established by showing a large number of failures in performance.[33] In support of its motion, the Government submitted 160 owner affidavits reporting 436 Wheel failures and the affidavit of a statistical expert projecting that the Government could have obtained 707 owner affidavits showing 1503 Wheel failures if all of the owners reporting failures who were known to NHTSA had been contacted.[34]

GM filed its initial opposition to the summary judgment motion on May 15,

**28.** Nader v. Volpe, Civ. No. 960–70 (D.D.C., filed Mar. 31, 1970).

**29.** Part III, Investigation Report Involving Alleged Wheel Failures, Chevrolet and GMC Trucks, NHSB, Sept. 3, 1970, at 3, 18. Loading information obtained from interviews with owners showed 10 Wheel failures at less than 1520 lbs. and a total of 52 Wheel failures at less than 2060 lbs.

**30.** See Letter, supra note 10, at 12–13, 24.

**31.** See Letter from Douglas W. Toms to E. N. Cole, Nov. 4, 1970, at 2, JA 277.

**32.** General Motors Corp. v. Volpe, 321 F.Supp. 1112 (D.Del.1970), aff'd as modified, 457 F.2d 922 (3d Cir. 1972).

**33.** Plaintiff's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment, July 12, 1972, at 24–6.

**34.** See Affidavit of Dr. Gary G. Koch at 3. Amici curiae—Ralph Nader, Larry Joel Silverman, The Center for Auto Safety, and Physicians for Automobile Safety—submitted a brief statement in support of plaintiff's motion for summary judgment.

1973, and submitted a further response on May 25, 1973. The defendant contended that only failures on non-overloaded plain trucks were relevant to the enforcement action because its two 1969 bulletins had adequately warned of any safety risk on overloaded trucks or trucks with campers or special bodies. GM urged that neither the 160 owner affidavits nor the statistical projection demonstrated that "even one failure" had occurred "on a non-overloaded straight pickup truck."[35] In addition, GM challenged the Government's proposed definition of defect, contending that Congress intended to adopt the common law definition of defect which required the plaintiff to show that product failures were not caused by owner misuse.[36]

On April 30, 1974, in the light of Judge Waddy's illness, the case was reassigned to Judge Gasch. He held a hearing on the summary judgment motion on May 22, 1974, and issued an opinion and order granting summary judgment on June 13, 1974. The District Court found that the Government's large number of failures theory was supported by the purpose and plain language of the Act, the administrative construction of the statute, and the need for practical and effective enforcement. It rejected GM's contention that the 1969 bulletins limited the scope of the enforcement proceeding to non-overloaded plain trucks.[37] The issue of GM's liability for civil penalties of up to $400,000 for failure to comply with the defect notification directive was deferred.[38] In a Memorandum and Order of July 30, 1974, Judge Gasch ordered GM to pay $100,000 in civil penalties.[39] That order is the subject of a separate appeal pending in this court.[40]

Following the summary judgment ruling, GM applied to the District Court for a stay pending appeal. The District Court denied defendant's motion on June 26, 1974.[41] The next day this court entered a stay pending appeal. In response to the Government's motion to vacate the stay as improvidently granted, this court conditioned the continuation of the stay upon the issuance of an interim notification to current owners of Trucks equipped with Wheels which advised them of Judge Gasch's ruling and the pendency of this appeal.[42]

## II. DEFINITION OF DEFECT

The District Court found that Congress intended "to have the manufacturer issue such [defect] notifications not only when there was a cognizable defect in design or manufacture but also when the evidence reveals a large number of failures of components or materials, *i. e., failures in performance*, regardless of the cause." (Emphasis in original.)

The District Court added: "This statute is designed specifically to warn a consumer before an accident occurs and a defect in performance, such as a 'large number of failures,' exposes the consumers to dangers of which they should promptly be notified." In its footnote 20, the court amplified: "Where the agency shows that there is a *prima facie* case of a defect in performance through the submission of evidence of a large number of failures of the *Wheel,* the only defense in such an instance is that this large number of failures did not occur for it is clear the failures of wheels are clear dangers to motor vehicle safety."[43]

GM concedes that a defect finding can be premised on a significant number of

**35.** Defendant's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment, May 15, 1973, at 33.

**36.** *Id.* at 36–41.

**37.** 377 F.Supp. at 249–50, 252–53.

**38.** Section 109(a) of the Act, 15 U.S.C. § 1398(a) (1970), provides for civil penalties of up to $1,000 for each violation with a maximum of $400,000 for any related series of violations. Section 103(b) of the 1974 amend-

ments, 88 Stat. 1478, raises the maximum penalty to $800,000.

**39.** 385 F.Supp. 598 (D.D.C.1974).

**40.** United States v. General Motors, No. 74–1887 (D.C.Cir., filed Sept. 17, 1974).

**41.** JA 51–54.

**42.** Order of Aug. 15, 1974.

**43.** 377 F.Supp. at 249 & n. 20.

failures in performance but contends that those failures must occur on vehicles operated in conformity with the manufacturer's specifications.[44] Under its definition of defect, GM claims that there is a genuine issue of material fact as to whether a significant number of Wheels have failed on Trucks operated within weight limitations set forth in the owner's manual.

For the reasons developed below, we find that the District Court erred in holding that the cause of failures is irrelevant to the defect determination. We also reject GM's specified use formulation of defect as unduly restrictive and not in conformity with legislative intention.

### A. Statutory Provisions

■ This enforcement action is brought pursuant to the Secretary of Transportation's determination under § 113(e) of the Act that the Wheels contain a "defect which relates to motor vehicle safety."[45] The definitional section, § 102, defines the two critical terms "defect" and "motor vehicle safety." Section 102(11) provides: " 'Defect' includes any defect in performance, construction, components, or materials in motor vehicles or motor vehicle equipment."[46] Section 102(1) provides:

"Motor vehicle safety" means the performance of motor vehicles and motor vehicle equipment in such a manner that the public is protected against unreasonable risk of accidents occurring as a result of the design, construction

or performance of motor vehicles . . . .[47]

These provisions indicate that a determination of "defect" does not require any predicate of a finding identifying engineering, metallurgical, or manufacturing failures. A determination of "defect" may be based exclusively on the performance record of the vehicle or component.

The District Court concluded that "the plain language" of the sections, when read in conjunction with the statutory purpose "to reduce traffic accidents," "forcefully demands" that defect notifications be sent whenever there are a large number of failures.[48] We find the language of the statute more opaque. The Act requires a "defect in performance" and does not on its face address the core issue, whether the causes of component failures are relevant to the determination of a "defect in performance." That is the question we must answer, and we begin our quest by turning to legislative history of the Act.

### B. Legislative History

The National Traffic and Motor Vehicle Safety Act of 1966 was a product of the heightened public interest in, and concern over, automotive safety during the mid-1960's.[49] The mounting human and economic cost of auto accidents and attacks by consumer advocates on dangerous vehicle designs prompted numerous legislative proposals dealing with the traffic safety problem.[50]

An Administration bill was introduced in both chambers in March, 1966. The

---

44. *See* Reply Brief of Appellant at 4.

45. 15 U.S.C. § 1402(e) (1970). The provision is set forth at note 4 *supra.*

46. 15 U.S.C. § 1391(11) (1970).

47. 15 U.S.C. § 1391(1) (1970).

48. *See* 377 F.Supp. at 249.

49. *See, e. g.,* Hearings on Traffic Safety before the Senate Commerce Comm., 89th Cong., 2d Sess. 1 (1966) (opening remarks of Senator Magnuson).

50. *See* H.R.Rep.No.1776, 89th Cong., 2d Sess. 11 (1966) (stating that 79 bills on various aspects of the traffic safety problem had been referred to the House Interstate and Foreign Commerce Comm.). *See also* Hearings, *supra* note 49, at 33 (remarks of Senator Ribicoff). President Johnson stressed the importance of the highway safety problem in his 1966 State of the Union Address and a special message on transportation.

purpose of the bill, like that of the enacted legislation, was "to reduce traffic accidents and the deaths, injuries, and property damage resulting from traffic accidents." [51] Although the bill dealt with all aspects of the traffic safety problem—the vehicle, the highway, and the driver—it focused on improving the safety of motor vehicles. The emphasis on upgrading motor vehicle safety reflected an understanding that a certain level of driver error and owner carelessness is inevitable. As Senator Ribicoff noted on the opening day of the Senate hearings, "the automobile manufacturer has a part to play, taking into account that a human being is never going to be perfect." [52]

Neither the original House or Senate bills contained a defect notification provision.[53] Shortly after the introduction of the bills, concerns regarding industry practice with respect to notice and repair of defects were voiced in committee hearings.[54] The defect notification provision ultimately incorporated in the Senate bill stemmed from an amendment introduced by Senator Mondale on April 18, 1966. His amendment was prompted by evidence that manufacturers either failed to notify purchasers of defects or merely stated that some unidentified "improvements" were necessary. The amendment sought to vindicate the owner's "right to know what hazards are associated with a particular product" by compelling manufacturers to give purchasers fair warning of the specific safety risks presented. Senator Mondale did not explain when defect notices should be issued, beyond stating that they were not required for minor defects but "must be sent in all cases involving a safety hazard." [55]

Senate consideration of this amendment and House examination of similar amendments reaffirmed the need for "uniform and prompt notification to vehicle owners of the discovery of any defects related to safety," [56] without further explication of the circumstances requiring manufacturers to furnish notifications. The Senate bill defined "defect" as "any defect in design, construction, components or materials" and the Senate Report indicated that the term "is used in the sense of an error or mistake in design, manufacture or assembly." [57] The concept of "defect in performance" did not appear in the Senate bill. That phrase first emerged in the final House bill, in the definition of defect. It was accepted by the conference committee and incorporated into the version subsequently enacted into law.[58] Neither the House Report nor the Conference Report comments on the intended scope of "defect" or "defect in performance."[59]

*Legislative History and GM's Intended Use Formulation*

█ In its argument in the District Court, GM seized on the language of the Senate Report and the absence of any meaningful statutory definition to argue

**51.** S.3005, 89th Cong., 2d Sess. § 2 (1966); H.R.13228, 89th Cong. 2d Sess. § 2 (1966).

**52.** Hearings, *supra* note 49, at 47; *see id.* at 160 (remarks of Senator Hartke), 253 (remarks of Senator Magnuson).

**53.** *See* S.3005, reprinted in Hearings, *supra* note 49, at 12–20; H.R.13228, reprinted in Hearings on Traffic Safety before the House Interstate and Foreign Commerce Comm., 89th Cong., 2d Sess. 2–10 (1966).

**54.** *See* Hearings, *supra* note 49, at 216–17 (remarks of Senators Robert Kennedy and Magnuson).

**55.** *See* 112 Cong.Rec. 8215–16 (1966) (remarks of Senator Mondale).

**56.** H.R.Rep.No.1776, *supra* note 50, at 28; *see* S.Rep.No.1301, 89th Cong., 2d Sess. 8 (1966), U.S.Code Cong. & Admin.News 1966, p. 2709.

**57.** S.Rep.No.1301, *supra* note 56, at 8, U.S. Code Cong. & Admin.News 1966, at p. 2716.

**58.** *See* H.R.Rep.No.1776; *supra* note 50, at 28; H.R.Rep.No.1919, 89th Cong., 2d Sess. 2, 15 (1966).

**59.** Similarly, the floor debates emphasized the importance of prompt notification of hazards posed by defects without expressly addressing what constitutes a defect. *See, e. g.,* 112 Cong.Rec. 14221 (remarks of Senator Magnuson), 14247 (remarks of Senator Mondale), 14255 (remarks of Senator Yarborough) (1966).

that "it must be assumed that Congress adopted the common law definition" of defect, requiring "the plaintiff to demonstrate, at the very least, that his misuse of the product was not the cause of the failure." [60] The District Court properly rejected appellant's contention. The Act was designed as a preventive measure "supplementary of and in addition to the common law of negligence and product liability." [61] Determinations of fault or liability relevant to the award of damages at common law are not controlling on the interpretation of the scope of this prophylactic defect notification legislation.

In its brief on appeal, GM contends that the District Court's standard ignoring the cause of performance failures cannot be squared with the common meaning of a defect. Appellant puts it that "an item of equipment cannot be called 'defective' in any sense if it only fails to operate properly when the applicable instructions and warnings are ignored." [62]

GM's approach does not measure up to the purpose of the defect notification provision and the statute as a whole. Congress was concerned with the day-to-day performance of motor vehicles in the myriad conditions of use experienced by the public, not the test data compiled by professional drivers on the manufacturer's proving grounds or performance specifications under laboratory conditions. The protection afforded by the Act was not limited to careful drivers who fastidiously observed speed limits and conscientiously complied with manufacturer's instructions on vehicle maintenance and operation. The mood of the statute is fairly identified by the comments of various Senators espousing the proposed legislation even before the notification provision was added by the House, as affording, in the words of Senator Hartke, "an added area of safety" to "an owner who is lackadaisical, who neglects regular maintenance, and doesn't switch his tires, doesn't keep them at proper pressure," and as observant that "this is the human factor we are talking about." [63]

GM's contention that there can be no "defect in performance" so long as the Wheel does not fail under loads specified by the manufacturer is undermined by its own description of the manner in which purchasers normally operate their trucks. As GM's counsel stated during the administrative proceeding: "We know, we always have known, everybody knows that trucks are overloaded on occasion." [64] A 1969 GM letter to the Federal Highway Administrator explained

---

60. See Defendant's Memorandum, supra note 35, at 37–41.

61. Larsen v. General Motors Corp., 391 F.2d 495, 506 (8th Cir. 1968) (dictum); cf. 112 Cong.Rec. 19663 (1966) (remarks of Representative Dingell noting that the House Bill preserved "every single common law remedy that exists against a manufacturer."). Section 108(c), 15 U.S.C. § 1397(c) (1970), expressly provides that compliance with the safety standards issued under the Act "does not exempt any person from any liability under common law."

In its reply brief, GM disavows any attempt "to interpose common law negligence or products liability defenses." (at 5).

62. Brief for Appellant at 27.

63. Hearings, supra note 49, at 160; see id. at 47 (remarks of Senator Ribicoff), 252–53 (remarks of Senator Magnuson) ("The point is, even if he was speeding, wasn't cautious, that even people who are not cautious can be pro-

tected. . . . We are all human, and we are not all careful."); cf. Hearings, supra note 53, at 66 (remarks of Representative Mackay).

Although the hearings were held before the introduction of the defect notification amendments and the remarks cited were not directed specifically to the defect notification problem, we believe that the statements are indicative of the intended scope of the Act.

64. Transcript of May 22, 1969, Meeting at 153 (statement of Frazer Hilder, Assistant General Counsel, General Motors); See Transcript of April 11, 1969, Meeting at 34 (statement of Alex C. Mair, Director of Engineering, Chevrolet, acknowledging that "We know and expect that some people overload it" and stating that the Wheel's safety factor is designed to accommodate "those loads under some general normal service that we expect in the United States, the kind of roads we have, the kind of break-ups they have in the spring, and the kind of usage.").

that "[i]n the case of trucks . . . the applicable GVW can be exceeded easily and will be exceeded unless the operator takes precautions against so doing" and that "owners have continued and will continue to exceed these limitations." [65] These statements underscore the realities of operation—owners do not always know or pay close attention to the weight of their cargo, and are not always scrupulous to make sure that tires are inflated to specified pressures, and loads carefully balanced front-to-back and side-to-side.[66] The reality of day-to-day operation embraces some to-be-expected overloading of the vehicle and overinflation of the tires, and this provides the proper context in which to evaluate vehicle performance.

■ When pressed at argument on appeal, counsel for GM conceded—what could not fairly be denied—that "it may very well be true that a manufacturer would have an obligation to anticipate some degree of misuse perhaps or failure to maintain and build in some additional margin for his product." The congressional purpose to warn owners about safety hazards requires notice not only where the vehicle fails when used in conformity with manufacturer's instructions, but also when there is an inadequate margin of safety to protect against failures during reasonably expected vehicle operation.

*Legislative History and the District Court's Definition*

While the District Court was on sound ground in rejecting GM's specified use

theory, it went too far in the other direction when it held that the cause of component failures was irrelevant to the defect determination. That ruling conflicts with the legislative history of the 1966 Act.

■ The Senate Report indicates that the "critical definitions which delimit the scope of the bill are those of 'motor vehicle' and 'motor vehicle safety.' " [67] The latter definition crystallizes the legislative intention to protect the public against vehicle performance posing an "unreasonable risk of accidents." [68] As the Senate hearings make clear, the word "unreasonable" was placed in the bill deliberately, to signify a "commonsense" balancing of safety benefits and economic cost.[69] A similar concern was expressed in the Senate Report's discussion of factors to be evaluated in setting safety standards for new motor vehicles. The report identified safety as "the overriding consideration" but agreed with the General Counsel of the Commerce Department that in promulgating standards "the Secretary will necessarily consider reasonableness of costs, feasibility and adequate leadtime." [70] In view of the Senate Report's identification of the motor vehicle safety definition as critical to the scope of the entire bill, and the linkage of the terms "defect" and "motor vehicle safety" in the notification provision (§ 113, quoted *supra* note 4), we find the "commonsense" approach of "motor vehicle safety" is relevant to the intended meaning of "defect." [71]

---

65. Letter from J. C. Bates to Francis C. Turner, Sept. 11, 1969, at 4–5.

66. A GM representative apparently recognized these factors in determining an overload of "15 per cent let us say" to be "reasonable." Transcript of May 22, 1969, Meeting at 138 (statement of E. M. Estes).

67. S.Rep.No.1301, *supra* note 56, at 5, U.S. Code Cong. & Admin.News 1966, at p. 2713.

68. *See* text accompanying note 47 *supra*.

69. Senator Magnuson, committee chairman stated: "The reason the word 'unreasonable' was put in there is that we hope there will be some commonsense applied to this." *See* Hearings, *supra* note 49, at 56. Senator Mag-

nuson noted that it would be impossible to "spell out what is reasonable or not reasonable in a piece of legislation," and emphasized the legislative purpose to "lay down what guidelines seem to be feasible in a general way, giving enough flexibility so [the Secretary] can be practical and sensible." *Id.* at 411.

70. S.Rep.No.1301, *supra* note 56, at 6, U.S. Code Cong. & Admin.News 1966, at p. 2714.

71. *See* United States v. General Motors, No. 74–277, 65 F.R.D. at 120 n. 19 (D.D.C., Oct. 16, 1974) (Judge Gasch concluded that "this 'commonsense' approach is intended to be applied to the Act as a whole.").

436

The commonsense limitation reflects an awareness that costs must be considered in determining what safety measures are required by the Act. While some margin of safety must be built-in to protect against failures during day-to-day operation, manufacturers are not required to design vehicles or components that never fail. It would appear economically, if not technologically, infeasible for manufacturers to use tires that do not wear out, lights that never burn out, and brakes that do not need adjusting or relining. Such parts cannot reasonably be termed defective if they fail because of age and wear.

 Similarly, a commonsense approach would not find defective a wheel that collapsed under a load, say, four times that specified, and, say, twice the load that might be projected as a use (or technical over-use) that could be deemed a realistic expectation. The District Court's decision that a large number of failures, regardless of cause, constituted irrebuttable proof of a "defect," ignores these commonsense limitations and must be rejected as incompatible with the discernible legislative intention.

C. *Subsequent History Clarifying Legislative Intent*

 Amendments to the Act contained in the Motor Vehicle and School-bus Safety Amendments of 1974 require manufacturers, in addition to furnishing defect notifications, to correct at their expense defects which relate to motor vehicle safety. The amendments neither alter the Act's definitions of defect and motor vehicle safety nor establish separate criteria for the manufacturer's notification and repair obligations.[72] The House Report on the amendments, issued approximately one month *after* the District Court's opinion, indicates that the cause of performance failure is relevant to the defect determination.

The remedy without charge requirement is intended to require manufacturers to correct at their expense defects in the performance, design, or construction of their products which relate to motor vehicle safety. It is not intended that manufacturers be required to make corrections if they can establish that the condition requiring correction results from the abuse of their products or the failure to adequately maintain them.[73]

We are aware that subsequent congressional actions may provide "a hazardous basis for inferring the intent of an earlier" Congress.[74] But here we are dealing with provisions that must be applied together and in relation to each other. What Congress was making clear was

72. *See* Section 102 of the Motor Vehicle and Schoolbus Safety Amendments of 1974, 88 Stat. 1470. Section 102 amended the 1966 Act, striking § 113 and adding §§ 151–60. New § 154 requires manufacturers to remedy without charge any defect for which a notification is required. 88 Stat. 1472. The standard and procedures governing the Secretary's decision to order the manufacturer to furnish defect notifications, set forth in § 152, is essentially the same as under § 113(e) of the original Act. *Compare* 15 U.S.C. § 1402(e) (1970) *with* 88 Stat. 1470. Section 154(a)(4) provides an exception from the general remedy without charge requirement for vehicles and equipment first purchased more than 8 years before notification was given or ordered. 88 Stat. 1473. Section 157 contains exception from both the notice and remedy obligations where the Secretary determines, after notice and opportunity for comment, that the defect "is inconsequential as it relates to motor vehicle safety." 88 Stat. 1475. Section (c) makes clear that the 1974 amendments do not apply to the present case since the notification was required to be issued "before the effective date" of the amendments. 88 Stat. 1477.

73. H.R.Rep.No.1191, 93d Cong., 2d Sess. 25 (1974), U.S.Code Cong. & Admin.News 1974, at p. 6059.

74. United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960); Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App. D.C. 308, 315, 486 F.2d 375, 382 (1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); *see* United States v. Southwestern Cable Co., 392 U.S. 157, 170, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). *But cf.* Haynes v. United States, 390 U.S. 85, 87 n. 4, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968) (noting that while the views of a subsequent Congress are not "controlling," they are nonetheless "pertinent.").

that the defects required to be notified were defects that would have to be repaired at the expense of the manufacturer, not at the expense of the consumer. (There is an exception of no present consequence, removing the obligation to repair or replace as to defects covered by notifications or notification directives issued eight years after the first purchase.) [75]

In general, the contours of the defects the manufacturer must remedy fairly delineate the defects that must be notified. We are on sound ground, then, in turning to the legislative understanding of those contours—expressed at a time when it was not making any change in the provisions that define them. In this context, we deem the 1974 House Report, which provides for some defense of abuse, to be a reliable explication of the scope of the original defect notification section.[76] Aware of the tension between its recognition of an abuse defense and the need for prompt notification, Congress added a provisional notification section to permit the agency to effectuate prompt notification of the problem while the defense was being litigated.[77]

### D. *Administrative Interpretation*

██ The District Court rested in part on the doctrine "[t]hat Courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute."[78] The District Court went astray, however, when it equated the theory advanced by the Government's litigating counsel with the administrative interpretation of the Act. The defect notification directive which the Government is attempting to enforce in this action rests on the agency's finding that a "significant number of wheel failures has occurred . . . under loads which are below the wheel strength level specified by the truck builder."[79] The agency's Investigation Report never set forth the theory of Government counsel based on large number of failures, irrespective of cause. The NHTSA's stated position is that "[w]hether a defect exists depends solely on the facts of each particular situation." It has explicitly declined to adopt any rule defining "safety related defect."[80] That the cause of failure cannot be ignored completely is clear from the 1973 testimony of Administrator Toms before the Senate Commerce Committee, stating that § 113 does not extend to "safety problems such as worn brakes or tires that occur in any aging vehicle as a result in normal wear and tear."[81]

### E. *Establishing a Defect in Performance*

██ The District Court settled on its definition of defect in part because it feared that an alternative interpretation

---

**75.** Section 154(a)(4) of the Act, as amended, 88 Stat. 1472.

**76.** Although the 1966 Act and the 1970 amendments did not incorporate proposals to require remedy of defects without charge, Congress expected that manufacturers would adhere to the general industry practice of repairing components subject to defect notifications. *See* Brief for Appellant at 24–25 n. 48 and sources cited therein. The 1974 amendments merely made explicit the remedy without cost responsibility and corrected deficiencies in the original statute concerning the persons required to be sent notices, the manner of mailing notices, and the authority to order interim notification pending the outcome of enforcement proceedings. *See* Sections 153(c), 154, 155(b), 88 Stat. 1471, 1472, 1474. Since the 1974 amendments retain the basic definitions and approach of the original statute, we find the discussion in the 1974 House Report relevant to our present inquiry. Supplemental memoranda submitted by the parties indicate that they believe that the House Report is highly pertinent to an understanding of the original provisions.

**77.** Section 155(b), 88 Stat. 1474 (1974).

**78.** 377 F.Supp. at 250, *quoting* Investment Co. Institute v. Camp, 401 U.S. 617, 626–27, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1970).

**79.** Part III, Investigation Report, *supra* note 29, at 3.

**80.** 38 Fed.Reg. 9509, 9510 (1973).

**81.** *See* Hearings on Auto Safety Repairs at No Cost before the Senate Commerce Comm., 93d Cong., 1st Sess. 9 (1973) (statement of Douglas W. Toms, Administrator, National Highway Traffic Safety Administration).

would force the Government "to attempt to show at trial that every failure was not due to owner abuse," thereby "negat[ing] any practical value of the notification scheme outlined in the Act." [82] Were this the case, we might well be more receptive to the District Court's approach. As this court recently noted, it is "our duty to favor an interpretation which would render the statutory design effective in terms of the policies behind its enactment and to avoid an interpretation which would make such policies more difficult of fulfillment, particularly where, as here, that interpretation is consistent with the plain language of the statute." [83] However, we do not find the District Court's approach necessary to the practical and efficient administration of the defect notification provision.

An enforcement proceeding under the Act is a trial de novo with the burden on the Government to prove a violation by a preponderance of the evidence. In discharging its burden in the present action, the Government need only establish a significant number [84] of Wheel failures resulting from operation of Trucks, in fact.[85] Where the Government introduces evidence of a significant number of failures as to which causes like age and expected wear and tear have been negated, it is entitled to rely on a presumption that such failures occurred under conditions of operation that were either within the parameters specified by the manufacturer or reflect reasonably-to-be-expected vehicle abuse (ordinary abuse) or failure to maintain. Where, as here, the relevant component is designed to function without replacement or repair for the life of the vehicle, a *prima facie* case of defect can be made simply by showing a significant number of failures.[86] The underlying presumption comports with the realities of vehicle operation and promotes fair and efficient enforcement of the statute.[87]

The presumption arising from proof of a significant number of wheel failures is not irrebuttable. It is here that we depart from the District Court, which tolerated no defense other than proof that the failures did not occur. We hold that the Act permits the manufacturer to establish, as an affirmative defense, that the failures were attributable to gross and unforeseeable owner abuse or unforeseeable neglect of vehicle maintenance.[88] This is in accord

---

**82.** 377 F.Supp. at 250.

**83.** National Petroleum Refiners Ass'n v. FTC, 157 U.S.App.D.C. 83, 100, 482 F.2d 672, 689 (1973); cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974).

**84.** We use the term "significant" to indicate that there must be a non-*de minimus* number of failures. The question whether a "significant" number of failures have taken place must be answered in terms of the facts and circumstances of each particular case. Relevant considerations include the failure rate of the component in question, failure rates of comparable components, and the importance of the component to the safe operation of the vehicle. The number of failures need not be and normally will not be a substantial percentage of the total number of components produced.

**85.** The Government must also show that the defect poses an unreasonable risk of accident, death, or injury. This requirement is not at issue in the present action. *See* note 112 *infra.*

**86.** In cases involving replacement items, no presumption would attach until the Government demonstrated that a significant number of failures occurred before the component's replacement age or mileage had been reached.

**87.** In view of the presumption set forth in text, the Government need not address the owner abuse issue to establish a *prima facie* case. The presumption alleviates the enforcement problems posed by requiring the Government to prove a negative—that every failure occurred on a Truck that was never grossly overloaded or unforeseeably abused. See discussion of proof required for summary judgment at text accompanying notes 112–14 *infra.*

**88.** The manufacturer will bear the burden of proving that the failures occurred on vehicles operated outside conditions of use or maintenance that were reasonably foreseeable under the circumstances. The terms "reasonably foreseeable", "reasonably contemplatable", and "ordinary abuse" are intended to reflect the expected range of actual operation taking into account past experience with comparable

with the 1974 House Report and the aforementioned commonsense limitation on the safety requirements of the Act.[89]

We have pondered the possibility that our approach may enable a manufacturer to attempt to avoid notice and correction obligations by dragging out the enforcement proceedings. That danger would appear inherent in any scheme designed to afford the manufacturers a fair opportunity to establish that gross and unforeseeable owner abuse caused the component failures. The danger is mitigated somewhat by the 1974 amendment allowing the Secretary to order provisional notification pending the resolution of the enforcement action.[90] And a trial on the issue of defect could be avoided whenever the Government introduced cognizable evidence establishing that a significant number of failures occurred on vehicles operated within the manufacturer's specifications or departures therefrom that the manufacturer could not reasonably contend constituted gross abuse.[91]

## III. PREVIOUS OWNER LETTERS

GM contends, as its second claim of error, that the letters sent to Truck owners in May, 1969, and October, 1969 comply with the notification requirements of § 113 of the Act and therefore constitute a defense to the present enforcement action.[92] GM argues that, at the very least, the prior letters contain adequate warning of the dangers of overloading, thereby requiring the Government to show a defect in non-overload situations to compel the mailing of additional notifications.

The District Court concluded that the prior settlement letters did not preclude the Government from relying on all available evidence to prove a safety-related defect. Under its large number of failures theory, the District Court found, on the basis of owner affidavits revealing numerous wheel failures, that all of the three-piece Kelsey-Hayes wheels were defective and ordered enforcement of the Administrator's notification directive.[93]

vehicles and information provided to owners about the capabilities of their vehicle. It is not "foreseeable" or "reasonably contemplatable", for example, that the 3/4 ton Trucks involved here would be loaded to 12,000 lbs. even though it is possible and perhaps probable that a handful of the more than 300,000 vehicles would be subjected to such abuse. *See* text accompanying notes 122–37 *infra* for a discussion of the facts relevant to foreseeability in the present case.

It is possible that the same component may contain a defect in performance relating to motor vehicle safety in one class of vehicle or use but not in another. For example, the reasonably foreseeable use and abuse of police cars is sufficiently different from the expected use of family owned cars that failures in police cars of a component common to both classes of vehicles might not signify a defect that would require notice to all owners.

It is open to the manufacturer to limit the scope of the defect finding by establishing that the failures in performance of a particular component are restricted to a specific, distinct type of use that differs from other types of vehicle operation. See discussion of NHTSA's treatment of failures of front suspension lower

control arm of 1965–69 full-size Fords in Brief for Appellant at 37–38.

**89.** GM construes the House Report as providing "a defense based on owner abuse or improper maintenance" and acknowledges that "the phrasing of this language might be read to place the burden to establish such a defense at trial on the manufacturer." Appellant's Supplemental Memorandum at 9. The Government also views the House Report as placing the burden of establishing any owner abuse defense on the manufacturer. Appellee's Supplemental Memorandum at 7–12.

**90.** *See* Section 155(b), 88 Stat. 1474 (1974).

**91.** *See* text accompanying notes 112–14 *infra.*

**92.** A third letter was sent to owners pursuant to the Aug. 15, 1974, order of this court continuing the stay pending appeal. It expressly states that GM believes that the Wheel does not contain a defect. This third letter, which is the functional equivalent of an interim notification under new § 155(b), provides no additional support for the second claim of error advanced by appellant.

**93.** *See* 377 F.Supp. at 252–53.

Although we depart from the District Court's defect definition, we believe its general approach to appellant's defense is basically sound. The October 8, 1969, settlement agreement explicitly reserved the agency's right to continue the investigation and take such further action in the interest of safety as the available information warranted. Nothing in the settlement agreement or the prior letters precluded the Government from using evidence of failures on overloaded Trucks or Trucks with campers to establish that notice of a safety-related defect involving all Wheels should be sent to purchasers. Were the Government to establish on remand that a significant number of wheels failed under conditions of normal use (including reasonably foreseeable abuse or failure to maintain), it would be entitled to summary judgment ordering GM to send defect notifications to purchasers warning that the Wheels lacked an adequate margin of safety and describing the resulting safety risks. The 1969 letters would pose no defense for they neither contained "a clear description" of this defect nor warned that it pertained to all of the three-piece Kelsey-Hayes wheels.[94]

Beyond this basic problem with appellant's proffered defense, there are deficiencies in the 1969 bulletins which undermine their adequacy. The purpose of the defect notification provision is "to notify the owner in clear and unmistakable terms" of the specific safety-related defect so that "corrective steps" could be taken.[95] The 1969 letters, however, do not acknowledge *any* defect in the three-piece Kelsey-Hayes wheels. Rather, they merely warn of safety risks posed by certain conditions of use. The May letter recommends corrective action when the Truck has been used to carry excessive loads "for any substantial period of time," implying that brief episodes of overloading pose no risk. The October letter's replacement offer, limited to Trucks with campers and other special bodies, may well have created the impression that Wheels on plain trucks presented no safety risk. NHTSA regulations, adopted in 1973, require an explicit statement that a defect relating to traffic safety exists and "prohibit the notification from stating or implying that the problem is not a defect."[96] These requirements, based on NHTSA's experience with owner reactions are designed to produce notifications that will induce consumers to have defective components repaired or replaced.[97] We cannot say that the 1969 letters which (1) were not viewed by the Agency as adequate when written,[98] (2) do not "clearly and unambiguously describe" the relevant defect, and (3) imply that "the problem is not a defect" meet the Act's notification requirement.

## IV. SUMMARY JUDGMENT

### A. *General Principles*

Our refinement and modification of the legal standard used by the Dis-

---

**94.** *See* Section 113(c), 15 U.S.C. § 1402(c) (1970) (requiring that notifications "contain a clear description" of the defect and "a statement of the measures to be taken to repair such defect.").

**95.** 112 Cong.Rec. 14247 (1966) (remarks of Senator Mondale); *see* 38 Fed. Reg. 2215, 2216 (1973) (NHTSA notice establishing regulations covering notification of motor vehicle defects); 49 C.F.R. § 577.2 (1973) (purpose of defect notifications).

**96.** 38 Fed.Reg. at 2216; *see* 49 C.F.R. §§ 577.-4(b)(1); 577.6 (1973).

**97.** *See* 38 Fed.Reg. 2215, 2216 (1973); Hearings, *supra* note 81, at 23 (statement of NHTSA Douglas W. Toms).

**98.** The transcript of the May 22, 1969 meeting at which the first letter was discussed indicates that the agency believed the Wheels contained a defect and should be replaced but agreed to the letter as an emergency measure. *See* note 21 *supra*. The October, 1969 letter was accepted as part of a compromise which afforded the public the advantage of free replacement of Wheels on Trucks with campers and special bodies. This advantage was deemed to outweigh the prospect of an enforcement order issued after lengthy court proceedings. *See* Federal Highway Administration Press Release, Oct. 9, 1969, at 2.

trict Court does not necessarily require reversal of its grant of summary judgment to the Government. An appellate court has discretion to uphold a summary judgment under a legal theory different from that applied by the trial court, and rest the affirmance "on any ground that finds support in the record," [99] provided it proceeds cautiously so as to avoid denying the opposing party a fair "opportunity to dispute the facts material" to the new theory.[100]

Summary judgment under Fed.R.Civ.P 56 eliminates useless trials by permitting a party "to pierce the pleadings and to assess the proof to see whether there is a genuine need for trial.[101] This court has recognized the "important functions" served by summary judgment in avoiding "long and expensive litigation" and "curbing the danger that the threat of such litigation will be used to harass or to coerce a settlement." [102] The vital role played by the summary judgment procedure is heightened in cases where the prospect of a lengthy trial itself endangers the effective vindication of the fundamental interests at issue.[103] In defect notification enforcement actions, such delay may lead to needless deaths and injuries.[104] However, litigants may not be cut off from their right to trial "if they really have issues to try".[105]

The party seeking summary judgment has the burden of showing there is no genuine issue of material fact,[106] even on issues where the other party would have the burden of proof at trial,[107] and even if the opponent presents no conflicting evidentiary matter.[108] "[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." [109] However, the moving party is entitled to the benefit of any relevant presumptions, and if the established facts and relevant presumptions would

**99.** *See* Jaffke v. Dunham, 352 U.S. 280, 281, 77 S.Ct. 307, 308, 1 L.Ed.2d 314 (1957); Helena Rubinstein, Inc. v. Bau, 433 F.2d 1021, 1023 (9th Cir. 1970); C. Wright & A. Miller, 10 Federal Practice and Procedure § 2116, at 440 (1973).

**100.** *Cf.* Fountain v. Filson, 336 U.S. 681, 683, 69 S.Ct. 754, 756, 93 L.Ed. 971 (1949); C. Wright & A. Miller, *supra* note 96, at 441–42 (dealing with the analogous situation in which summary judgment is granted on appeal to a party who did not move for summary judgment below).

**101.** 31 F.R.D. 647, 648 (1963) (Advisory Committee's Note on Rule 56); *see, e. g.,* Engl v. Aetna Life Ins. Co., 139 F.2d 469, 472 (2d Cir. 1943). The additions to Rule 56(e) in 1963 strengthened "the weapon of summary judgment as a device to screen out sham issues of fact," National Life Ins. Co. v. Silverman, 147 U.S.App.D.C. 56, 66, 454 F.2d 899, 909 (1971), but did not alter the "standards applicable to the summary judgment motion." 31 F.R.D. at 648.

**102.** *See, e. g.,* Washington Post Co. v. Keogh, 125 U.S.App.D.C. 32, 35, 365 F.2d 965, 968 (1966), cert. denied, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967).

**103.** *See id.* ("In the First Amendment area, summary procedures are even more essential.").

**104.** The interim notice procedure of new § 155(b) provides some protection pending res-

olution of the enforcement action. However, since the manufacturer is under no obligation to repair without charge until the resolution of the enforcement proceeding, § 155(b)(E), many owners may fail to correct defects. *See* S.Rep. No.150, 93d Cong., 1st Sess. 7 (1973) (indicating that 75% of owners have responded to recall campaigns in which the manufacturer absorbed the repair cost as opposed to a 7.6% response in one case in which GM refused to pay for repairs).

**105.** Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944). *Accord, e. g.,* Bloomgarden v. Coyer, 156 U.S. App.D.C. 109, 114, 479 F.2d 201, 206 (1973); Washington v. Cameron, 133 U.S.App. D.C. 391, 395, 411 F.2d 705, 709 (1969).

**106.** Bloomgarden v. Coyer, *supra* note 105, 156 U.S.App.D.C. at 114–15, 479 F.2d at 206–07.

**107.** *See,* Franklin Nat'l Bank v. L. B. Meadows & Co., 318 F.Supp. 1339, 1343 (E.D.N.Y.1970); 6 J. Moore, Moore's Federal Practice 56.15[3], at 2342–43 (2d ed. 1974).

**108.** *See, e. g.,* Adickes v. S. H. Kress & Co., 398 U.S. 144, 160, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); 31 F.R.D. 647, 648 (1963).

**109.** United States v. Diebold, 369 U.S. 654, 655, 82 S.Ct. 993, 994 8 L.Ed.2d 176 (1962), *see, e. g.,* Weiss v. Kay Jewelry Stores, Inc., 152 U.S.App.D.C. 350, 353, 470 F.2d 1259, 1262 (1972).

have entitled him to a directed verdict at trial, he is entitled to a summary judgment under Rule 56.[110] In terms of procedure, plaintiff establishes a *prima facie* case on motion for summary judgment if he has made out a case on affidavits and presumptions, that would entitle him to a directed verdict if uncontroverted at trial; summary judgment will generally be granted unless the opposing party offers evidence demonstrating "a ground of defense fairly arguable and of a substantial character," or unless he presents good reasons, in accordance with Rule 56(f), for the failure to offer "facts essential to justify his opposition" to the motion.[111]

## B. *Application to Defect Notification Actions*

 We come now to the application of these well-established principles to the showing required for summary judgment in a defect notification action. We are speaking of a context where, as here, it is undisputed that the failures pose an unreasonable risk of accidents, death, or injury.[112] In such a context, the Government makes out a *prima facie* case by offering competent evidence showing a significant number of failures in performance not attributable to age or wear—a showing which suffices to generate a presumption that the failures have occurred under conditions of specified use or ordinary (*i. e.* reasonably anticipated) abuse. At trial, such evidence, if uncontroverted, would entitle the Government to a directed verdict. It likewise suffices to entitle the Govern-

ment to the grant of its motion for summary judgment, unless the manufacturer comes forward with evidence which creates a material issue of fact concerning the number of failures shown or the cause of the failures.[113] Where the Government makes the additional showing of a significant number of failures under conditions of operation that are within the manufacturer's specifications or departures therefrom that could not reasonably be deemed gross abuse, the manufacturer cannot avoid summary judgment unless he contradicts or negatives this showing. Evidence offered by the manufacturer indicating that a number of these or other failures of the relevant component occurred under conditions that could reasonably be deemed gross abuse is not sufficient if it still leaves the plaintiff with an uncontested showing that a significant number of failures occurred under conditions of specified use or ordinary abuse.

 In the case at hand, a careful review of the record leads us to the following conclusions: The Government, through 160 owner affidavits reporting 436 Wheel failures and the affidavit of a statistical expert projecting that the Government could have obtained 707 owner affidavits showing 1503 Wheel failures, clearly proffered evidence showing a significant number of failures in performance.[114] It is undisputed in this case that the Government's showing also negatives age and wear as a cause of failures: the item is one that is designed for the life of the vehicle [115] and the

110. *See, e. g.,* Engl v. Aetna Life Ins. Co., 139 F.2d 469 (2d Cir. 1943); 6 Moore's Federal Practice 56.11[10], at 2210 (2d ed. 1974).

111. *See, e. g.,* 6 Moore's Federal Practice 56.11[3], at 2163, 56.15[3], at 2347, 56.24, and cases cited therein; 10 C. Wright & A. Miller, *supra* note 96, § 2727, at 536–37, § 2740, at 723–24, and cases cited therein.

112. Section 113(a) requires that the defect related to motor vehicle safety and § 102(1) defines motor vehicle safety in terms of protecting the public against an "unreasonable risk of accidents" and an "unreasonable risk of death or injury." *See* 15 U.S.C. §§ 1402(a);

1391(1); note 4 *supra.* The question of risk is not at issue in the present case because, as the District Court noted, failures of wheels present a clear danger of accidents and injuries. *See* 377 F.Supp. at 249 n. 20.

113. Such evidence can be developed by the manufacturer through the use of the discovery rules and from its own sources.

114. *See* note 34 *supra.* "General Motors has never denied that a significant number of wheels failed." Defendant's Opposition to Plaintiff's Motion for Summary Judgment at 33.

115. *See* note 9 *supra.*

affidavits reveal a number of failures at relatively low mileages.[116] Such a coupling of a significant number of failures and absence of age and wear as a cause is ordinarily sufficient to establish a *prima facie* case for the Government on its motion for summary judgment and to place on the manufacturer the burden to come forward not only with papers in opposition but with a proffer of evidence of gross abuse.[117] In this case, however, the Government's affidavits on their face supply facts on which GM could predicate a genuine affirmative defense. That comes about even though the Government's showing of a substantial number of failures was not generally accompanied by a showing of conditions of use. While the bulk of the 160 affida-

vits contain little if any data on the loading history of the Trucks,[118] some do reveal failures on Trucks that were plainly loaded substantially in excess of their gross vehicle weights,[119] thus raising an issue of gross abuse. In this composite, the Government's own papers suffice to show disputed issues of material fact.[120]

We interject that at trial the Government may well prevail on the ground *e. g.* that even substantial overloading in excess of gross vehicle weights (of 5500–6700 lbs.) is not outside the zone of ordinary abuse, in view of the 7500 lb. maximum shown on the GVW plate. See part C, below. But this depends on an issue of fact, and must be determined by the fact tribunal, and not by an appel-

116. *See, e. g.,* Affidavit of Henry V. Backman (failures at approximately 14,862 miles and 26,526 miles); Affidavit of Charles M. Bubniak (failure at approximately 10,500 miles); Affidavit of Richard L. Eppes (failure at approximately 5,000 miles); Affidavit of George H. J. Hart (first of three failures at approximately 2,000 miles).

117. As noted previously, such evidence by the manufacturer is sufficient to gain a trial unless the Government has offered evidence (that remains uncontroverted) that a significant number of failures occurred under conditions of specified use or ordinary abuse.

118. The absence of information on loading history appears to stem from the Government's view that even gross and unforeseeable owner abuse was irrelevant to the defect determination, for the Government made no real effort to obtain loading information as a part of its affidavit gathering program. *See* Deposition of Roman Leo Brooks, Apr. 6 and 9, 1973, at 123, 126 JA 86, 87. Loading information is included in Part III of NHSB's Investigation Report, see documents 45–60 and failure data summary in support of the Part III report, but the Government apparently did not attempt to recontact owners in order to obtain sworn affidavits suitable for submission in support of its summary judgment motion.

119. *See, e. g.,* Affidavit of William F. Ince (truck weighed 4470 lbs. and used to carry loads of approximately 2500–3200 lbs.); Affidavit of Richard L. Eppes (truck and camper weighed 7100 lbs.); Affidavit of J. Miles McGrew (truck used on occasion to haul 3,000 lbs. of grain); Affidavit of Dennis Taylor (total weight of truck and load—9,700 lbs.); Affidavit of S. R. Jennings (admit truck too light for loads; replaced with 1½ ton truck); Affidavit

of Roger B. Kelley (weight fully loaded approximately 8,000 lbs.); Affidavit of Harry A. Thacker (camper; loaded weight of 7300 lbs.).

Other affidavits suggest that some Wheels failed under loads at or slightly in excess of the manufacturer's specifications. *See,* Affidavit of Millard Lee Clark (total weight of 5800 lbs., previously used without failures on ½ pickup truck); Affidavit of Clyde R. Polen (average load of 700 lbs. without driver and passengers; truck empty weighed approximately 4200 lbs.); Affidavit of John D. Murray (total weight of truck and camper 5600 lbs.); Affidavit of Gerald C. Anderson (truck equipped with 650 lbs. camper and 190 lbs. boat); Affidavit of Delbert E. Bales (camper weighs 1,080 loaded for trip); Affidavit of George P. Coulsting (present owner never loaded beyond 5500 lbs.; purchased used); Affidavit of Frank S. Humic (truck weighed twice with camper— 5,220 lbs., 5,680 lbs.); Affidavit of Herman Laeder (truck used primarily as passenger vehicle; equipped with canopy cover and occasionally used to haul "light load of camping equipment.").

120. In addition to revealing some cases of significant overloading, the affidavits show that more than 100 of the 160 owners equipped their Trucks with campers. Although these campers varied in size and weight, most of the campers were from 8 to 10½ feet in length. And some of the Trucks which were loaded substantially in excess of gross vehicle weights carried campers. *See* note 119 *supra.* Viewing the inferences from these facts in the light most favorable to GM, we cannot say on the present state of the record that there are no genuine issues of material fact.

late court decision that there is a rule of law that requires affirmance even though the rule of law relied on by the trial court for summary judgment, was in part unsound.

■ The Government's supplemental memorandum, filed after argument on appeal, indicates a misunderstanding of the burden placed on a party seeking summary judgment. Appellee argues that the "record demonstrates that General Motors has not discharged the burden of proving owner abuse."[121] But, although GM would bear that burden at trial, in view of the Government's *prima facie* showing of a significant number of performance failures, GM is entitled to that trial. The present state of the record at least does not leave us with the conviction that there are no material factual issues to try.

Finally, our view that GM has a case for trial does not import any view on how the case would come out if the record, as it now stands, were all that was put before the trial court. The aforementioned presumption that failures occurred under specified use or ordinary abuse serves to shift both the burden of producing evidence and the burden of persuasion to the manufacturer who must prove that the significant number of failures resulted from gross abuse. Consequently, even if GM were to present evidence setting forth instances of load levels substantially in excess of gross vehicle weights and testimony of manufacturing officials, like that in its affidavits, as to their inability to foresee such loading levels at the time the Wheels were offered as options on the Trucks, the trier of fact could conclude that GM failed to prove the overloading constituted gross abuse or find

that the instances of gross abuse shown were not sufficient to overcome the presumption that the significant number of failures occurred under conditions of specified or ordinary abuse.

### C. *Factors Pertinent to GM's Gross Abuse Defense*

The Government's motion and appeal papers attack GM's gross abuse defense as unsubstantial but, while its points may well have considerable force at trial, they do not conclusively show that there is no need for a trial. The Government's points relate to a cluster of factual issues bearing on what constitutes gross abuse under the facts of this case.

1. The first issue is what the Truck owners reasonably understood to constitute the specified loading limitation. GM contends that the "owner's manuals which accompanied these vehicles in 1960–65 adequately informed the owners of the load limits of the Kelsey-Hayes wheel."[122] Charts in the manual setting forth the tire capacity at various inflation pressures indicated a maximum load of 1520 lbs. for the 7.00 x 15 6-ply tire, 1800 lbs. for the 7.00 x 15 8-ply tire, and 2060 lbs. for the 7.50 x 15 8-ply tire. GM's position seems to be that it is these specifications of permitted use (in a range of 1520–2060 lbs. per tire) that identify the starting point for measuring abuse that could reasonably be anticipated.[123] And GM further asserts that it could not reasonably have anticipated that the Trucks equipped with Wheels would be used to carry large cab-over campers. It submits an affidavit stating that both the number and the size of campers purchased grew dramatically in the mid-1960's and suggesting that it was this unexpected development that resulted in the overloading of Trucks and consequent Wheel failures.[124]

---

121. Appellee's Supplemental Memorandum at 12.

122. Brief for Appellant at 39–40.

123. Even this premise may be subject to the Government's challenge that, since the performance failures involved Wheel not tire failures, the relevant capacity was that of the Wheel itself (2060 lbs.), even when a 6-ply tire was used. NHSB analyses concluded that

"the strength capacity of any given three-piece wheel is essentially the same with either the 6-ply or the 8-ply tire installed." *See* Part III, Investigation Report, *supra* note 29, at 13.

124. Affidavit of James T. Riley at 8–10, JA 181–83. More than 100 of the Government's 160 owner affidavits involved Trucks equipped with campers.

The Government vigorously disputes the adequacy of the load warnings, contending that the information supplied by GM to truck owners led many of them reasonably to conclude that their trucks were suitable for loads of 7500 lbs. and were designed to carry large cab-over campers. First, the Government notes that the GVW plate permanently affixed to each Truck read "Maximum GVW Rating 7500 lbs."[125] Although the plate also stated that "Equipment and Tires for Gross Vehicle Weight Ratings are Listed in Load Capacity Chart in Owner's and Driver's Manual," the Government argued that this did not alleviate the misunderstanding because the GVW charts in the manuals contained entries for a number of wheel-tire combinations but did not contain any entries for the 15″ Kelsey-Hayes wheels, and therefore would not have specified to an owner reading the manual that those wheels produced a GVW less than the 7500 lbs. shown on the plate.

The only charts in the manual containing data for 15″ Wheels were tables headed "Tire Inflation Tables for Highway Service."[126] The Government points out that an owner would not be alerted that there was vehicle loading information in these crucial tables either by the tables' caption or by a pertinent index entry.[127] Finally, an owner was not informed how to translate the maximum tire capacity shown by the table into gross vehicle weight. Thus, an owner might simply and naturally make the computation revealed in an affidavit of record, that is multiply the tire capacity by four.[128] If we use the 1800 lbs. figure for a 7.00 x 15 8-ply tire, the multiplication yields a figure of 7200 lbs.—20% above the 6000 lbs. figure that is produced by correct engineering calculations not set forth in the manual.

Reports contained in Part III of the Investigation Report and the affidavits submitted in support of the summary judgment motion reveal that a substantial portion of owners experiencing Wheel failures understood from the GVW plate that their Truck's GVW was 7500 lbs.[129] Indeed, many owners reported that appellant's dealers informed them that the GVW was 7500 lbs.[130]

As to the use of Trucks with large cab-over campers, the Government points to information supplied to purchasers as indicating that such use was foreseeable. The Chevrolet brochure for the 1965 model year[131] shows a Series 20 pickup truck equipped with a cab-over camper and towing a sizable motorboat.[132] Furthermore, owner reports and affidavits

---

125. The GVW plate is pictured at pages 8a & 13a of the appendices to appellant's brief.

126. Tire inflation charts and GVW charts from the 1960–65 owner's manuals are set forth at JA 255–72.

127. *See* Part II, Investigation Report, *supra* note 14, at 18–19.

128. *See, e. g.,* Affidavit of Robert Greenlea. Prior to purchasing the truck, I questioned the dealer about the weight carrying capability of 7.00 x 15 8-ply tires. He did not have the answers so he called the General Motors Representative in Los Angeles. I talked to this Representative on the phone and he explained that the 7.00 x 15 8-ply tire has a weight capability of 1,900 pounds or 7,600 pounds for all four. I was convinced so I purchased the unit.

129. More than 40 of the 160 affidavits stated that the owner thought his truck's GVW was 7500 lbs.

130. *See, e. g.,* Affidavit of Clell Andreasen; Affidavit of Lewis D. Banta; Affidavit of Bernard Hier; Affidavit of Charles L. Molt; Affidavit of D. C. Simming; Affidavit of Kenneth Skaggs.

131. *See* Item 29 accompanying Part II of the Investigation Report, *supra* note 14.

132. *See* Affidavit of Frank Lineback. The affidavit stated in part:

When I purchased the truck at the Felix Chevrolet Company of Los Angeles, I was shown advertising that the truck was recommended for campers. The dealer always assured me that the advertising and information available to them indicated that the truck would handle the load I wanted to use on it, namely the Alaskan camper.

relate that some dealers sold Trucks with campers already installed and many dealers assured purchasers that the Trucks equipped with Wheels were suitable for the purchasers' large cab-over campers.[133]

2. Related to the dispute over the maximum load limits that owners should reasonably have understood as specified for their Trucks is the question of the amount of deviation from this figure which GM should have anticipated in designing the Wheel. During the administrative proceedings, a GM vice-president stated that the Wheel was designed to accommodate "a *reasonable* overload of 15 percent" and "a *reasonable* extra tire pressure" of about 15 lbs.[134] However, experts presented by consumer interests (as amicus curiae) at the September 30, 1970, meeting indicated that in their opinion the 15 percent margin did not include a safety factor adequate for reasonably-to-be-expected factors—expected moderate overloading and overinflation of tires, and variations in manufacturing and fabrication.[135]

3. Another set of unresolved issues concerns the length and extent of "overloading" required to cause cracks in the Wheel capable of producing a failure at a later point under even subnormal loads. Both the Government and the District Court placed great emphasis on a GM statement that "a brief period of excess loading can cause a crack to occur in a wheel [which] . . . may develop to the point of wheel failure with further use of the truck."[136] This broad statement about wheels in general was later modified by GM in a letter to the Government agency, using language to the effect that "short-term *abnormally* high loadings" or "a brief period of *substantial* excess loading" could cause "a crack to occur in a wheel."[137]

The GM statements raise the issue whether there are separate problems of short-term peak overloading and sustained ordinary overloading. A higher, short-term margin of safety might be required of the manufacturer in view of the foreseeability of one or more brief periods of peak excessive loading during the lifetime of many of the Wheels.

## V. CONCLUSION

The Government's motion for summary judgment was premised on the theory that a defect could be established by showing a large number of performance failures regardless of cause. Affidavits submitted by the Government supplied the large number of failures required to obtain judgment under its definition of defect. After carefully considering the language, purpose, history, and administrative interpretation of the Act, we have concluded that the District Court erred in accepting the Government's theory and foreclosing the possibility of an affirmative defense of gross abuse.

Our heft of the record leaves us with an understanding of the forces pressing the District Court to adopt the Government's interpretation of the statute. Here the Government had shown a large number of sudden and potentially catastrophic failures of a critical vehicle component. In addition, it put forth evidence suggesting that under the particular circumstances of this case there was a very wide range of reasonably foreseeable deviation from the manufacturer's calculations of gross vehicle weight, producing a high threshold to be hurdled by a manufacturer relying on an affirmative defense of gross abuse. And the manufacturer, after extensive and prolonged discovery, introduced no evidence of its own documenting vehicle overloading of a magnitude sufficient to raise a

**133.** Approximately 50 of the 160 owner affidavits reveal that the dealer was advised that the truck was being purchased for use with a camper.

**134.** Transcript of May 22, 1969, Meeting at 138 (statement of E. M. Estes) (emphasis added).

**135.** Transcript of Sept. 30, 1970, Meeting at 22–23 (statement of Prof. Martin E. Barzelay).

**136.** Letter, *supra* note 65, at 8; *see* 377 F.Supp. at 253; Brief for Appellee at 14, 54, 57.

**137.** *See* Letter, *supra* note 10, at 12 (emphasis added).

substantial question of gross abuse as the cause of performance failures.

Despite these emanations from the record, we cannot uphold the reasoning that the cause of performance failures is irrelevant to the determination of a defect. We find that a component is defective if it is subject to a significant number of failures in performance occurring on vehicles operated under conditions of specified use or reasonably foreseeable abuse or failure to maintain (ordinary abuse). As we noted in Parts II E and IV B of this opinion, the Government can make a *prima facie* showing by presenting evidence of a significant number of failures in performance unrelated to age or wear of the component. Such a showing places a burden on the manufacturer to prove that the failure resulted from gross owner abuse. Under this formulation of defect, we find that there are presently genuine issues of material fact concerning the manufacturer's affirmative defense based on gross and unforeseeable owner abuse.

That the current record is largely devoid of data on the loading histories of Trucks experiencing Wheel failures is regrettable, but understandable in view of the positions of the parties on the motion for summary judgment. The Government contended that the cause of failures was irrelevant and did not request owners submitting affidavits to include loading information. As we have noted, some of the owner affidavits reported loads which substantially exceeded the Truck's gross vehicle weight and are not palpably within the zone of ordinary abuse. At the same time, the affidavits suggest that many if not most owners experiencing failures and some dealers understood the specified load limitation to be 7500 lbs., the figure on the GVW plate affixed to the Trucks. Moreover, the affidavits reveal that many dealers assured purchasers that the Trucks equipped with the Wheels were adequate for large cab-over campers. GM made no attempt to document the extent of overloading *vel non* on Trucks experiencing failures, since it was preoccupied with defending against the Government's contention that the cause of failures was irrelevant, and with advancing its own theory that the Government was required to prove a large number of failures on plain trucks operated within specified conditions of use. The Government's own proof generated an issue through the not insignificant number of Government affidavits that showed overloading substantially in excess of gross vehicle weights.

We have concluded that summary judgment cannot be granted on the present state of the record. On remand the Government, if it be so advised, is free to amend its motion and offer additional evidence in an attempt to demonstrate that it is entitled to summary judgment.[138] Otherwise, unless the case is settled, the controversy must proceed to trial. In view of the summary judgment motion's focusing of the material issues remaining in dispute, the trial judge should be able to narrow the scope of questions for trial. This may be accomplished for instance through stipulations of the parties or the use of the court's Rule 56(d) powers to specify "the facts that appear without substantial controversy" as a result of the motion for summary judgment. By taking an active role in distilling the issues for trial and structuring the order in which the issues are tried, the District Court may well be able to avoid adding a lengthy trial to this already protracted litigation.

The judgment is reversed and the case remanded for further proceedings not inconsistent with this opinion.

So ordered.

---

**138.** *See* Krieger v. Ownership Corp., 270 F.2d 265, 273 (3d Cir. 1959) (en banc) ("[T]he District Court is free to consider any motion which may be presented to it and to permit such amendments to the pleadings or the filing of such affidavits by either party to the action as it may deem permissible.").